**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **KELLY HOLT, INDIVIDUALLY,** | § | |
| **JEDIDIAH HOLT, INDIVIDUALLY,** | § | |
| **GEORGIA DEAN, AS NEXT FRIEND** | § | |
| **OF J.R.H, A MINOR, AND JAMES** | § | |
| **RICHARD HOLT, INDEPENDENT** | § | |
| **EXECUTOR OF THE ESTATE OF** | § | |
| **"HOLT", DECEASED** | § | |
| | § | **No.4:16-cv-02898** |
| | § | |
| **PLAINTIFFS** | § | |
| | § | |
| | § | |
| **vs.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| | § | |
| **ST. LUKE'S HEALTH SYSTEM, DOING** | § | |
| **BUSINESS AS CHI ST. LUKE'S** | § | |
| **PATIENTS MEDICAL CENTER,** | § | |
| **PMC HOSPITAL, L.L.C, DOING** | § | |
| **BUSINESS AS CHI ST. LUKE'S** | § | |
| **PATIENTS MEDICAL CENTER,** | § | |
| **KEVIN A. LISMAN, M.D.,** | § | |
| **HOUSTON CARDIOVASCULAR** | § | |
| **ASSOCIATES, EVAN B. TOW, M.D.** | § | |
| **AND TUE NGUYEN, M.D.** | § | |
| | § | |
| | § | |
| **DEFENDANTS** | § | |
| | § | |

**PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Kelly Holt, individually, Jedidiah Holt, Individually, Georgia Dean, as Next Friend of J.R.H., a minor, and James Richard Holt, Independent Executor of the Estate of "Holt", Deceased, and file this their Plaintiffs' First Amended Original Complaint, complaining of St. Luke's Health System, doing business as CHI St. Luke's Patients Medical Center, PMC Hospital, L.L.C., doing business as Chi St. Luke's Patients Medical Center, Kevin A. Lisman, M.D., Houston Cardiovascular Associates,

Evan B. Tow, D.O., and Tue Nguyen, M.D., Defendants and for cause of action would state as follows:

## A.  Parties

1.      All plaintiffs are residents of and citizens of Harris County, Texas.

2.      Defendants St. Luke's Health System, doing business as CHI St. Luke's Patients Medical Center and PMC Hospital, L.L.C., doing business as Chi St. Luke's Patients Medical Center have answered and appeared herein.

3.      Kevin A. Lisman, M.D. is a citizen of Harris County, Texas and he has answered and appeared herein.

4.      Houston Cardiovascular Associates is a professional association of physicians and it has answered and appeared herein.

5.      Evan B. Tow, D.O. is a citizen of Galveston County, Texas and he may be served with citation at 516 Southport Lane, Kemah, Texas 77565.

7.      Tue Nguyen, M.D. is a citizen of Harris County, Texas and may be served with citation at 4600 E. Sam Houston Parkway, Pasadena, Texas 77505.

## B.  Jurisdiction

8.      Jurisdiction is proper in this case pursuant to 28 U.S.C.A. § 1331 (federal question), as this action arises out of violation of 42 U.S.C.A. § 1395dd (a) and (b) (EMTALA).

## C.  Venue

9.      Venue is proper in this court pursuant to 28 U.S.C.A. § 1391 (a) (1993), because a substantial part of the events or omissions giving rise to the claim occurred in Houston, Texas.

D. Plaintiffs' Demand for Jury Trial

10.    Plaintiffs assert their rights under the Seventh Amendment to the U.S. Constitution and demand, in accordance with the Federal Rule of Civil Procedure 38, a trial by jury on all issues.

E. Conditions Precedent

11.    All conditions precedent have been performed or have occurred.

F. Facts

12.    J.R.H., whose date of birth is December 16, 2004, is the biological daughter of Jessie Ross Holt, deceased.

13.    Kelly Holt was at all times material hereto lawfully married to Jessie Ross Holt, and is the surviving spouse of Jessie Ross Holt, deceased.

14.    Jedidiah Holt is the surviving son of Jessie Ross Holt, deceased.

15.    James Richard Holt is the duly appointed independent executor of the Estate of Jessie Ross Holt, Deceased.

16.    Jessie Ross Holt (hereinafter referred to as "Holt") was born on August 2, 1971.

17.    Kelly Holt was born on March 30, 1967.

18.    On or about January 11, 2016, at approximately 4:00 p.m., "Holt" was brought emergently to CHI St. Luke's Patients Medical Center (hereinafter referred to as the "Hospital"), located at 4600 East Sam Houston Parkway, Pasadena, Texas 77505, in an ambulance, suffering from an emergency medical condition, as defined by 42 U.S.C.A. § 1395dd(e), to wit:  a cardiac arrest.  The facts that were within the actual knowledge of the "Hospital" are that at approximately 3:15 p.m. "Holt" was running on a treadmill at 24 Hour Fitness, his heart started pounding, he passed out and fell, he started to turn blue, his arms curled up, cardiopulmonary resuscitation was administered to revive him, after a few minutes he became awake and confused, and he had a history of suffering from severe aortic stenosis (a structural cardiac disorder).  Additional facts within the actual

knowledge of the "Hospital" are that on July 31, 2013, "Holt" had undergone a transesophageal echocardiogram at the "Hospital" that showed his aortic stenosis was severe.  After "Holt" arrived in the "Hospital's" emergency department, he was still groggy but he knew to tell the emergency department personnel about his aortic stenosis.  An electrocardiogram was performed and it was borderline.  His creatine kinase was highly elevated at 303 (indicative of heart muscle damage).  Diagnostic imaging showed that he had cardiomegaly.  He had a grade three heart murmur.

19.      On the occasion stated in paragraph 18 above, "Holt" presented himself to said emergency department and a request for examination or treatment for a medical condition was made.

20.      On January 11, 2016, the "Hospital" was required to provide "Holt" with an appropriate medical screening examination within the capability of the "Hospital's" emergency department, including ancillary services available to the "Hospital's" emergency department, that was calculated to identify critical medical conditions and to determine whether or not an emergency medical condition existed.

21.      Such an appropriate medical screening examination required that "Holt" be admitted to the "Hospital," that he be evaluated by a cardiologist, that he have an echocardiogram performed to evaluate the severity of his documented aortic stenosis, that the records of previous echocardiograms be evaluated, and that Kevin A. Lisman, M.D. be notified and consulted about the severity of the aortic stenosis.

22.      On January 11, 2016, the "Hospital," acting through its agents, servants and/or employees, had actual knowledge that "Holt" was suffering from an emergency medical condition, as defined by 42 U.S.C. §1395dd(e)(1)(A), to wit:  a cardiac arrest, which was evidenced by his having had a syncope episode that caused him to turn blue, that required that he have cardio-pulmonary resuscitation to survive the syncope episode and that he had severe aortic stenosis.  Said syncope episode and aortic stenosis were

being manifested by acute symptoms, such that in the absence of immediate medical attention it could reasonably be expected to result in placing the health of "Holt" in serious jeopardy.

23.     The "Hospital" had in place a policy and procedure that stated in part as follows: "*It is the policy of Patients Medical Center that:  Any patient who comes to the facility requesting an examination or treatment for a medical condition must be provided with an appropriate medical screening examination to determine if the patient is suffering from an Emergency Medical Condition, and, if it is determined that the individual has an Emergency Medical Condition, to provide the individual with such further medical examination and treatment as required to stabilize the Emergency Medical Condition, within the capability of Patients Medical Center, or to arrange for transfer of the individual to another medical facility in accordance with procedures set forth before.*" That policy and procedure defined a Medical Screening Examination as follows:  "*the process required to determine, with reasonable clinical confidence, whether an Emergency Medical Condition does or does not exist.  It is an ongoing process and must reflect continued monitoring according to the patient's needs and must continue until he/she is stabilized or appropriately transferred.  The exam will include information about the chief complaint, the patient's vital signs, mental status assessment, general appearance, and focused physical exam related to the patient's complaint.*"

24.     The "Hospital' failed to provide "Holt" with such a medical screening examination. The "Hospital" knew that "Holt" was suffering from an emergency medical condition.  The "Hospital" should have admitted "Holt" to the "Hospital" and called in one of its medical staff cardiologists to examine "Holt" and order further testing.  "Holt's" very severe aortic stenosis required that his aortic valve be replaced, that he be confined to bed, and that he be kept from strenuous exercise.  "Holt" was neither stabilized or transferred, but was simply discharged after approximately two hours.

25.     On January 11, 2016, the "Hospital", acting through its agents, servants and/or employees, did not stabilize the emergency medical condition that "Holt" was suffering from or transfer him to a hospital where he could be stabilized.

26.     On January 11, 2016, the "Hospital," acting through its agents, servants and/or employees, discharged "Holt" without admitting him to the "Hospital" and providing him treatment to stabilize said emergency medical condition or transfer him to a facility that would provide him necessary treatment to stabilize his emergency medical condition.

27.     On January 11, 2016, if the "Hospital," acting through its agents, servants and/or employees, provided "Holt" with the required screening and stabilization, "Holt" would have been treated with a routine aortic valve replacement and he would have lived a normal life expectancy.

28.     On or about April 8, 2016, "Holt" was jogging on a treadmill at a gym and he collapsed and was transported by ambulance to Bayshore Medical Center in Pasadena, Texas.  He was pronounced dead at Bayshore Medical Center on April 8, 2016.  An autopsy established that the untreated severe aortic stenosis caused "Holt's" untimely death.

29.     On or about January 11, 2016, the "Hospital," acting through its agents, servants and/or employees, discharged "Holt", and told him that he was only dehydrated.  The "Hospital" did not provide him with an echocardiogram, or a consultation with a cardiologist, or communicate with his personal cardiologist, or examine existing echocardiograms.

30.     "Holt," shortly after being discharged from the "Hospital," telephoned Houston Cardiovascular Associates to speak with Kevin A. Lisman, M.D. and discuss the events that led to his being emergently taken to the "Hospital" and the events at the "Hospital." He was only able to speak with a medical assistant employee of Houston Cardiovascular Associates.   The medical assistant thereafter informed "Holt" that Dr. Lisman was of the

opinion that "Holt" was just dehydrated, to keep himself well hydrated, and to let them know if it happened again.

31.     At all times material hereto, a physician-patient relationship existed between Kevin A. Lisman, M.D. and "Holt."

32.     At all times material hereto, a physician-patient relationship existed between Evan B. Tow, D.O. and "Holt."

33.     At all times material hereto, a physician-patient relationship existed between Tue Nguyen, M.D. and "Holt."

34.     On or about July 31, 2013, at the "Hospital," "Holt" underwent a transesophageal echocardiogram, which showed he had a severe aortic stenosis.  Records reflecting the performance of said transesophageal echocardiogram and the report that "Holt" had been diagnosed with a severe aortic stenosis were present in the "Hospital" on January 11, 2016, and the "Hospital" had actual knowledge of such facts.

35.     Between November 13, 2013 and April 8, 2016, "Holt" was a patient of Houston Cardiovascular Associates and Kevin A. Lisman, M.D. was assigned to provide him with cardiology services.  During that period of time, echocardiograms were performed on "Holt" to evaluate his heart and aorta.  Those echocardiograms showed in part as follows:

   a. On November 13, 2013 the aortic valve max PG was 57.0 mmHg, the mean PG was 34.0 mmHG, and the velocity was 3.7 cm/sec.

   b. On November 12, 2014 the aortic valve max PG was 76.0 mmHg, the mean PG was 48.0 mmHG, and the velocity was 441 cm/sec.

   c.  On November 13, 2015 the aortic valve max PG was 103.0, the mean PG was 69.0 mmHG, and the velocity was 546 cm/sec.

36.     The echocardiogram on November 13, 2015 showed that "Holt's" aortic stenosis had gotten much worse from the November 2014 echocardiogram.  It should have been

recommended to him that he undergo an aortic valve replacement and not exercise strenuously until he had an aortic valve replacement.

37.     On November 24, 2015 an agent, servant or employee of Houston Cardiovascular Associates and Kevin A. Lisman, M.D. spoke with "Holt" and told him that the November 12, 2015 echocardiogram results were unchanged from the previous echocardiogram.  That information was false and very misleading.  "Holt" should have been told that the November 12, 2015 echocardiogram results showed that his aortic stenosis had severely worsened, that he should undergo an aortic valve replacement, and that he should not engage in strenuous exercise.  The misrepresentation and erroneous information caused "Holt" to continue his strenuous exercise regimen, and when he was in the "Hospital's" emergency department on January 11, 2016, he did not know this information and thus did not know to inform the "Hospital" or the agents, servants or employees of the "Hospital" that he had a very severe aortic stenosis that required an aortic valve replacement.  The acts and omissions of Houston Cardiovascular Associates and Kevin A. Lisman, M.D. in providing false and misleading information about the November 12, 2015 echocardiogram ultimately caused the "Hospital" on January 11, 2016 to be misled about the seriousness of "Holt's" condition.

38.     At all times material hereto, Houston Cardiovascular Associates and Kevin A. Lisman, M.D. had actual knowledge that Sathish Cayenne, M.D, a cardiologist, had performed a transesophageal echocardiogram on July 31, 2013, that was reported to document that "Holt" suffered from severe aortic stenosis, and that "Holt" had been referred to Michael Sweeney, M.D., cardiothoracic surgeon to evaluate him for an aortic valve replacement procedure.  "Holt" had the consultation with Michael Sweeney, M.D., and aortic valve replacement was discussed and deferred pending a second opinion. "Holt" was referred to Houston Cardiovascular Associates and Kevin A. Lisman, M.D. for a second opinion and continued medical management of the severe aortic stenosis.

G.  EMTALA CAUSE OF ACTION AGAINST ST. LUKE'S HEALTH SYSTEM, DOING BUSINESS AS CHI ST. LUKE'S PATIENTS MEDICAL CENTER AND PMC HOSPITAL, L.L.C. DOING BUSINESS AS CHI ST. LUKES PATIENTS MEDICAL CENTER

39.      Plaintiffs incorporate by reference all of the allegations contained in paragraphs 18 through 38 above.

40      At all times material hereto, Defendants St. Luke's Health System, doing business as CHI St. Luke's Patients Medical Center and PMC Hospital, L.L.C., doing business as Chi St. Luke's Patients Medical Center, hereinafter collectively referred to as the "Hospital," owned and/or operated Chi St. Luke's Patients Medical Center located at 4600 East Sam Houston Parkway, Pasadena, Texas.  Chi St. Luke's Patients Medical Center was a hospital within the meaning of 42 U.S.C.A. § 1395dd(a).

41.      At all times material hereto, the "Hospital" had an emergency department within the meaning of 42 U.S.C.A. § 1395dd(a).

42.      On or about January 11, 2016, "Holt" came to the emergency department at the "Hospital" and a request was made for examination or treatment for a medical condition, within the meaning of 42 U.S.C.A. § 1395dd(a).

43.      When "Holt" presented to the emergency department at the "Hospital", on January 11, 2016, the "Hospital" had actual knowledge that he was suffering from an emergency medical condition, as defined by 42 U.S.C.A. § 1395dd(e)(1)(A), to wit:  a cardiac arrest.  The "Hospital" had actual knowledge that at approximately 3:15 p.m. "Holt" was running on a treadmill at 24 Hour Fitness, his heart started pounding, he passed out and fell, he started to turn blue, his arms curled up, cardiopulmonary resuscitation was administered to revive him, after a few minutes he became awake and confused, and he had a history of suffering from severe aortic stenosis (a structural cardiac disorder).  Additional facts within the actual knowledge of the "Hospital" are that on July 31, 2013, "Holt" underwent a transesophageal echocardiogram at the "Hospital"

that showed his aortic stenosis was severe.  After "Holt" arrived in the "Hospital's" emergency department he was still groggy, but he knew to tell the emergency department personnel about his aortic stenosis.  An electrocardiogram was performed and it was borderline.  His creatine kinase was highly elevated at 303 (indicative of heart muscle damage).  Diagnostic imaging showed that he had cardiomegaly.  He had a grade three heart murmur.

44.     After the "Hospital" determined and documented that "Holt" had an emergency medical condition, the "Hospital" failed to provide "Holt", within the staff and facilities available at the "Hospital," for such further medical examination and treatment as was required to stabilize said emergency medical condition within the meaning of 42 U.S.C.A. § 1395dd(b)(1)(A) or to transfer him to another medical facility within the meaning of 42 U.S.C.A. § 1395dd(b)(1)(B). Said violations of 42 U.S.C.A. § 1395dd(b)(1)(A) and (B), were a proximate cause of the complained of untimely wrongful death of "Holt" and conscious pain and mental anguish suffered by "Holt" from January 11, 2016 until his death on April 8, 2016.  As a result of such violation, the "Hospital" is legally liable for the complained of damages.

45.     On or about January 11, 2016, after "Holt" had come to the emergency department at the "Hospital" and made a request for examination or treatment for a medical condition, within the meaning of 42 U.S.C.A. § 1395dd(a), the "Hospital" failed to provide "Holt" with a medical screening examination within the capability of the "Hospital's" emergency department that was routinely available to said emergency department, that was calculated to identify critical medical conditions and to determine whether or not an emergency medical condition existed.

46.     When "Holt" presented to the emergency department at the "Hospital" on January 11, 2016, he sought a medical screening and treatment for a cardiac arrest.

47.     When "Holt" presented to the emergency department at the "Hospital", on January 11, 2016, seeking a medical screening and treatment of the cardiac arrest, the "Hospital" failed to admit him to the "Hospital," failed to provide him an echocardiogram, failed to provide him a consultation by a cardiologist, failed to evaluate past echocardiograms, failed to perform stress testing, and failed to notify and consult with "Holt's" cardiologist, and such failures amounted to a violation of 42 U.S.C.A. § 1395dd(a).  Said violation of 42 U.S.C.A. § 1395dd(a) was a proximate cause of the complained of untimely wrongful death of "Holt" and conscious pain and mental anguish suffered by "Holt" from January 11, 2016 until his death on April 8, 2016.  As a result of such violation, the "Hospital" is legally liable for the complained of damages.

48.     These causes of action against the "Hospital" are not healthcare liability claims within the meaning of Texas Civil Practice & Remedies Code § 74.001(13), and the damage caps that apply and pertain to a healthcare liability claim are not applicable in this case.  Plaintiffs' causes of action against the "Hospital" do not required any proof that the Hospital violated any standard of care, and therefore the causes of action are not healthcare liability claims.

> H.  COMMON LAW CAUSE OF ACTION AGAINST ST. LUKE'S HEALTH SYSTEM, DOING BUSINESS AS CHI ST. LUKE'S PATIENTS MEDICAL CENTER AND PMC HOSPITAL, L.L.C. DOING BUSINESS AS CHI ST. LUKES PATIENTS MEDICAL CENTER

49.     Plaintiffs incorporate by reference all of the allegations contained in paragraphs 18 through 38 above.

50.     On or about January 11, 2016, agents, servants, and/or employees of the "Hospital" acted negligently in providing hospital, nursing and medical services to "Holt" and such negligence was a proximate cause of "Holt's" untimely death and Plaintiffs' damages.

51.     At all times material hereto, Evan B Tow, D.O. and Tue Nguyen, M.D. were ostensible or apparent agents of the "Hospital," and therefore the "Hospital" is vicariously liable for all of Plaintiffs' damages that were proximately caused by the negligence of Evan B Tow, D.O. and Tue Nguyen, M.D.

52.     In the alternative, if "Holt" was stable while a patient in the "Hospital's" emergency department on January 11, 2016, and capable of receiving medical treatment as a nonemergency patient, then Evan B. Tow, D.O. and Tue Nguyen, M.D. acted negligently in providing medical services to "Holt" and such negligence was a proximate cause of "Holt's" untimely death and Plaintiffs' damages.  In the alternative, if "Holt" was suffering from a bona fide emergency as defined by the Texas Civil Practices & Remedies Code section 74.151, then Evan B Tow, D.O. and Tue Nguyen, M.D. acted willfully or their conduct was wantonly negligent.  In addition, Evan B Tow, D.O. and Tue Nguyen, M.D. acted in providing said medical care to "Holt" in expectation of remuneration.

53.     The nurse employees of the "Hospital" acted negligently in violation of the Texas Nurses Practice Act, (Texas Administrative Code, Chapter 217, rule 217.11) by failing to utilize a systemic approach to provide individualized, goal-directed nursing care by (a) performing a comprehensive nursing assessment regarding the health status of "Holt", (b)  making nursing diagnoses that serve as the basis for the strategy of care, and (c) developing a plan of care based on the assessment and nursing diagnosis.  Additionally, said nurse employees failed to institute the safe harbor or go up the chain of command because it was obvious to any reasonably prudent registered nurse that the physicians were not responding appropriately to "Holt's" medical needs.  Such negligence was a proximate cause of the complained of death of "Holt" and Plaintiffs' damages.

I.   COMMON LAW CAUSE OF ACTION AGAINST EVAN B. TOW, D.O. AND TUE NGUYEN, M.D.

54.     Plaintiffs incorporate by reference all of the allegations contained in paragraphs 18 through 38 above.

55.     In the alternative, if "Holt" was stable while a patient in the "Hospital's" emergency department on January 11, 2016, and capable of receiving medical treatment as a nonemergency patient, then Evan B. Tow, D.O. and Tue Nguyen, M.D. acted negligently in providing medical services to "Holt" and such negligence was a proximate cause of "Holt's" untimely death and Plaintiffs' damages.  In the alternative, if "Holt" was suffering from a bona fide emergency as defined by the Texas Civil Practices & Remedies Code section 74.151, then Evan B Tow, D.O. and Tue Nguyen, M.D. acted willfully or their conduct was wantonly negligent.  In addition, Evan B Tow, D.O. and Tue Nguyen, M.D. acted in providing said medical care to "Holt" in expectation of remuneration.

56.     On January 11, 2016, Evan B Tow, D.O. and Tue Nguyen, M.D. had actual knowledge that "Holt" had suffered a cardiac arrest and that he had an aortic stenosis and that he was under the care of a cardiologist.  They had actual knowledge of the facts stated in paragraph 18 above.  They failed to consider that "Holt's" aortic stenosis was related to the cardiac arrest and diagnose that the aortic stenosis was a cause of the cardiac arrest, they failed to admit "Holt" to the "Hospital," they failed to communicate with "Holt's" cardiologist, they failed to call in a cardiologist on the "Hospital's" on call schedule, and they discharged "Holt" with a false and erroneous diagnosis of dehydration.

J.  COMMON LAW CAUSE OF ACTION AGAINST KEVIN A. LISMAN, M.D. AND
HOUSTON CARDIOVASCULAR ASSOCIATES

57.      Plaintiffs incorporate by reference all of the allegations contained in paragraphs
18 through 38 above.

58.      Kevin A. Lisman, M.D. acted negligently in providing medical treatment to "Holt",
and such negligent medical treatment was a proximate cause of the complained of
untimely death of "Holt".

59.      More specifically, Kevin A. Lisman, M.D. and agents, servants or employees of
Houston Cardiovascular Associates failed to inform "Holt" that the November 12, 2015
echocardiogram showed that "Holt's" aortic stenosis had worsened to a critically severe
state and recommend that "Holt" should undergo an aortic valve replacement.  On
November 24, 2015, they erroneously told "Holt" that there was no change from the
previous echocardiogram.

60.      On January 12, 2016, after being informed of the events that occurred on
January 11, 2016, Kevin A. Lisman, M.D. and agents, servants or employees of Houston
Cardiovascular Associates erroneously told "Holt" that he was just dehydrated, they
failed to examine "Holt," they failed to advise "Holt" to refrain from strenuous exercise,
they failed to inform "Holt" that he now had a critically severe aortic stenosis that was
symptomatic and strongly recommend that "Holt" undergo an aortic valve replacement.

61.      At all times material hereto, Kevin A. Lisman, M.D. was a partner, principal,
agent, servant and/or employee of Houston Cardiovascular Associates, and was at all
times material hereto acting within the course and scope of such relationship.  Houston
Cardiovascular Associates and all the partners of Houston Cardiovascular Associates
are vicariously liable for the negligent conduct of Kevin A. Lisman, M.D. and the agents,
servants, and/or employees of Houston Cardiology Associates.

<u>K.  Damages</u>

62.	Plaintiffs seek all legal damages to which they are entitled because of the above and foregoing.  These damages are within the jurisdictional limits of this court.

63.	The Estate of "Holt", Deceased. seeks to recover the following damages:

    a)  Physical pain from January 11, 2016 until April 8, 2016, and

    b)  Funeral and burial expenses.

64.	Kelly Holt seeks to recover the following damages:

    a)  Loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Kelly Holt, in reasonable probability, would have received from "Holt". had he lived;

    b)  Loss of companionship and society, the loss of the positive benefits flowing from the love, comfort, companionship, and society that Kelly Holt, in reasonable probability, would have received from "Holt" had he lived; and

    c)  Mental anguish, the emotional pain, torment, and suffering experienced by Kelly Holt because of the death of "Holt".

65.	Georgia Dean seeks to recover the following damages on behalf of J.R.H., a minor, daughter of "Holt".

    a)  Loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that J.R.H., in reasonable probability, would have received from "Holt" had he lived;

    b)  Loss of companionship and society, the loss of the positive benefits flowing from the love, comfort, companionship, and society that J.R.H., in reasonable probability, would have received from "Holt" had he lived; and

    c)  Mental anguish, the emotional pain, torment, and suffering experienced by J.R.H., because of the death of "Holt".

66.    Jedidiah Holt seeks to recover the following damages:

    a)  Loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Jedidiah Holt, in reasonable probability, would have received from "Holt" had he lived;

    b)  Loss of companionship and society, the loss of the positive benefits flowing from the love, comfort, companionship, and society that Jedidiah Holt, in reasonable probability, would have received from "Holt", had he lived; and

    c)  Mental anguish, the emotional pain, torment, and suffering experienced by Jedidiah Holt because of the death of "Holt".

## L. Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendants be served with citation and be required to answer and appear herein; that after a jury trial herein, they have judgment against Defendants, both jointly and severally, as follows:

    a)  Judgment against Defendants for all of Plaintiffs' actual damages, both general and special, as described above;

    b)  Pre-judgment and post-judgment interest pursuant to Tex. Rev. Civ. Stat. Ann. art. 5069-1.05;

    c)  Costs of court; and

    d)  Such other relief to which Plaintiffs may be entitled, both general and special.

Plaintiffs' First Amended Original Complaint

Respectfully submitted,

THE ONSTAD LAW FIRM

By: _____
        ROCKNE W. ONSTAD
State of Texas Bar No. 15291000
Southern District Federal I.D. No. 7074
Email:  rock@onstadlaw.com
119 Ranch Road 620 South
Austin, Texas  78734-5609
Telephone (512) 263-7600
Facsimile (512) 263-7800

**ATTORNEY FOR PLAINTIFFS**

### CERTIFICATE OF SERVICE

        I certify that on 24th day of February 2017, a true and correct copy of the above and foregoing instrument was served on the following counsel of record in accordance with Fed.R.Civ.P 5(b)(2)(E) and L.R. 5.1.

        Luccia & Evans, L.L.P., Frank N. Luccia, Texas Bar No. 12664400, Southern District Federal ID: 10384, fnluccia@luccia-evans.com, Lauren M. Virene, Texas Bar No. 24087980, Southern District Federal ID:  2166180, lvirene@luccia-evans.com, 8 Greenway Plaza, Suite 1450, Houston, Texas 78746.  Telephone 713-629-0002, Facsimile 713-629-0004.  Attorneys for Defendants St. Luke's Health System, doing business as CHI St. Luke's Patients Medical Center, PMC Hospital, L.L.C., doing business as Chi St. Luke's Patients Medical Center

        Boston & Hughes, P.C., James R. Boston, Jr., Texas Bar No. 02681200, Southern District Federal ID: 3323, jboston@bostonhughes.com and Gary Sommer, Texas Bar No. 24010415, Southern District Federal ID: 2646895, gsommer@bostonhughes.com, 8584 Katy Freeway, Suite 301, Houston, Texas 77024.  Telephone 713-961-1122, Facsimile 713-961-0883.  Attorneys for Kevin A. Lisman, M.D. and Houston Cardiovascular Associates.

_____
        ROCKNE W. ONSTAD