UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KELLY HOLT, ET AL | § § § § | |
| PLAINTIFFS | § § | No.4:16-cv-02898 |
| vs. | § § § § | |
| ST. LUKE'S HEALTH SYSTEM, DOING BUSINESS AS CHI ST. LUKE'S PATIENTS MEDICAL CENTER, ET AL | § § § § § § | JURY TRIAL DEMANDED |
| DEFENDANTS | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' ST. LUKE'S HEALTH SYSTEM D/B/A CHI ST. LUKES PATIENTS MEDICAL CENTER AND PMC HOSPITAL, LLC D/B/A CHI ST. LUKE'S PATIENTS MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT (DOCUMENT 36)**

To the Honorable United States District Judge Lee H. Rosenthal:

1.      Plaintiffs ask the court to deny Defendants' St. Luke's Health System d/b/a CHI St Lukes Patients Medical Center and PMC Hospital, LLC d/b/a/ St. Luke's Patients Medical Center's (hereinafter collectively referred to as the "Hospital") Motion for Summary Judgment (Document No. 36), because the summary judgment evidence raises a fact issue on each of the grounds on which Movants seek summary judgment.

2.      The testimony and affidavit of Plaintiffs' expert, John MacGregor, M.D, Ph.D., both fully support Plaintiffs' allegations and raise a fact issue on all the grounds the "Hospital" has raised as a basis for its motion for summary judgment. Dr. MacGregor squarely and unequivocally testified in his deposition[1] and his affidavit[2] that the "Hospital" failed to provide Mr. Holt with an

---

[1] Appendix Exhibit 2 Deposition of John MacGregor, M.D., Ph.D. 237.24 – 240.7
[2] Appendix Exhibit 3 at paragraph 8

appropriate medical screening examination, that it inappropriately discharged Mr. Holt in an unstable condition,[3] and that it failed to adhere to its own policy and procedure to provide Mr. Holt with adequate discharge instructions.[4]

3.      The "Hospital's" emergency room physician (Evan Tow, D.O), who attempted to fulfill the "Hospital's" EMTALA obligation, was so concerned about Mr. Holt that he believed that Mr. Holt needed to be seen immediately by a cardiologist because Mr. Holt had severe aortic stenosis and he had a syncope episode while exercising.[5]  The "Hospital's" emergency room crew all knew that Mr. Holt required cardiopulmonary resuscitation (CPR) to revive him after he passed out and started turning blue.[6]  The reported fact that Mr. Holt required CPR was so important that it required that he be provided with further medical examination by admitting him into the hospital in the care of an internist with a consultation by a cardiologist.[7]  Dr. Tow was the "Hospital's" designee who was required to provide the appropriate medical examination.  The appropriate medical examination was to be a focused examination on Mr. Holt's chief complaint. The most critical component of that chief complaint was that Mr. Holt required CPR after passing out and turning blue to revive him.  The evidence establishes that everyone in the emergency department knew about the CPR element of Mr. Holt's chief complaint, but surprisingly, Dr. Tow claimed in his deposition that he did not know about the CPR.

4.      The failure of the "Hospital" to provide Mr. Holt with the exam that included information about the chief complaint, the patient's vital signs, mental status assessment, general appearance, and a focused exam related to the patient's complaint violated the "Hospital's" policy and procedure required by EMTALA to make sure that an appropriate medical screening examination would be provided to Mr. Holt, and every other patient who presented with the

---

[3] Appendix Exhibit 2 Deposition of John MacGregor, M.D., Ph.D. 240.8 -241.11
[4] *Id.* at 240.8 – 241.11
[5] Appendix Exhibit 4, Deposition of Evan Tow, D.O. 80.25 - 82.13
[6] Appendix Exhibit 7, Deposition of Jason Case, R.N. 20.7 – 21.4, 54.5 – 20, and 74.11 – 75.11; Appendix Exhibit 6, Deposition of Elbert Delacruz, R.N. 12.12 – 13.10 and 32.1 – 16
[7] Appendix Exhibit 4, Deposition of Evan Tow, D.O. 24.4 -22; 39.9 – 23; and 70.21 – 71.6

same or similar chief complaint.  Such requirement presumes that everyone dealing with the patient knows what the patient's chief complaint is.

5. Failure of Dr. Tow to know that Mr. Holt's chief complaint included that CPR was required to revive him is by itself a violation of EMTALA and the "Hospital's" policy and procedure.

6. Dr. Tow admitted that he talked to the EMS crew and the EMS crew imparted information that was pertinent while Mr. Holt was still on a stretcher.[8]  In spite of Dr. Tow claiming in his deposition that he did not know about the CPR, there is evidence that he did know about the CPR.  Dr. Tow blamed the nurses for not telling him about the CPR,[9] even though the CPR was documented in the triage nurse's notes.[10]  Dr Tow testified it was his responsibility to know about the CPR.[11]  Dr. Tow admitted that with CPR in the chief complaint and medical condition that everyone knew about, that Mr. Holt should have been worked up as a cardiac arrest and that he should have been admitted to the hospital and seen by a cardiologist.[12]  This evidence is fully developed in Plaintiffs' Brief filed herein in support of their response to the "Hospital's" motion for summary judgment and the appendix.

7. It is submitted that the same evidence that proves that a hospital fails to provide an appropriate medical screening examination can also be evidence of negligence.  That is true in this case.  Movants conceded that Dr. Tow was negligent.  However, the "Hospital" was required to provide Mr. Holt with a medical examination that focused on Mr. Holt's chief complaint of having been revived by CPR.  Everyone in the emergency department knew Mr. Holt's chief complaint included that he had been revived by CPR.  The most basic and essential element of providing a

---

[8] Appendix Exhibit 4, Deposition of Evan Tow, D.O. 62.14 - 22
[9] Appendix Exhibit 4, Deposition of Evan Tow, D.O. 38.4 - 12
[10] Appendix Exhibit 5, Deposition of Christina Hamlyn, R.N. 18.16 – 19.3 and Appendix Exhibit 9, Hospital's medical chart on Jessie Holt at page 48
[11] Appendix Exhibit 4, Deposition of Evan Tow, D.O. 38.4 – 12
[12] *Id.* at 29.10 - 30.16, 39.9 - 39.23, 70.21 - 71.6

patient with an appropriate medical examination is for the "Hospital's" emergency department personnel to know the critical and important elements of the chief complaint.

8. The summary judgment evidence raises a fact issue and supports a claim of negligence and a claim of EMTALA violation. Dr. Tow testified that you cannot provide an appropriate medical screening examination if you do not have all the available facts in front of you.[13] He further testified that it was his responsibility to know what the triage nurse knew and documented and what Nurse Delacruz knew: that after Mr. Holt passed out, he started turning blue, that his arms curled up, and that he was provided with cardio-pulmonary resuscitation (CPR).[14] The evidence establishes that the fact that Mr. Holt was provided with CPR to revive him was an important fact, and was so important that had Dr. Tow known about the CPR that Mr. Holt would have been worked up as a cardiac arrest, admitted to the hospital and had a consultation by a cardiologist. Dr. Tow's claim in his deposition that he failed in his responsibility to know about the CPR is both a violation of EMTALA and negligence. The essence of fulfilling the EMTALA medical screening examination is to first know what the patient's chief complaint is.

9. Plaintiffs have sued the "Hospital" for damages arising in part out of Movant having violated 42 U.S.C.A. § 1395dd(a) and (b) known as EMTALA. (Plaintiffs' First Amended Complaint Document 19) in the following particulars:

a. After the "Hospital determined that Jessie Holt was suffering from an emergency medical condition, it failed to provide him, within the staff and facilities available at the "Hospital" for such further medical examination and treatment as was required to stabilize the emergency medical condition within the meaning of 42 U.S.C.A. § 1395dd (b)(1)(A) or to transfer him to another facility within the meaning of 42 U.S.C.A. § 1395dd (b)(1)(B), . . . ; and [15]

---

[13] Id. at 87.14 - 19
[14] *Id.* at 38.4 - 12
[15] Document 19 paragraph 44

b. . . .  the "Hospital failed to provide Jessie Holt with a medical screening examination within the capability of the "Hospital's" emergency department that was calculated to identify critical medical conditions and to determine whether or not an emergency medical condition existed.[16]

10. The "Hospital" had in place a policy and procedure[17] required by EMTALA for compliance with EMTALA that provided in part as follows:

> Any patient who comes to the facility requesting an examination or treatment for a medical condition must be provided with an appropriate medical screening examination to determine if the patient is suffering from an Emergency Medical Condition, and, if it is determined that the individual has an Emergency Medical Condition, to provide the individual with <u>such further medical examination</u> and treatment as required to stabilize the Emergency Medical Condition, within the capability of Patients Medical Center, or to arrange for transfer of the individual to another medical facility in accordance with the procedures set forth before.
>
> \* \* \* \* \* \* \*
>
> Medical Screening Examination – the process required to determine, with reasonable clinical confidence, whether an Emergency Medical Condition does or does not exist.  It is an ongoing process and must reflect continued monitoring according to the patient's needs and must continue until he/she is stabilized or appropriately transferred.  The <u>exam will include information about the chief complaint</u>, the patient's vital signs, mental status assessment, general appearance, and a <u>focused exam related to the patient's complaint</u>.
>
> \* \* \* \* \* \* \*
>
> When it is determined that the individual has an Emergency Medical Condition, Patients Medical Center shall:

---

[16] *Id*. paragraph 45
[17] Appendix Exhibit 10

    i. Within the capability of the staff and facilities at Patients Medical Center, stabilize the individual to the point where the individual is either stable for discharge or stable for transfer.

To stabilize or stabilize or stabilized means:

    With respect to an Emergency Medical Condition, that the individual is provided with such medical treatment as is necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the patient from Patients Medical Center;

<u>Stable for discharge means</u>:

    The physician has determined within reasonable clinical confidence, that the patient has reached the point where his/her continued medical treatment, including diagnostic work-up or treatment, could reasonably be performed as an outpatient or later as an inpatient, as long as the patient is given a plan <u>for appropriate follow-up care with discharge instructions</u>

    Stable for discharge does not require the final resolution of the Emergency Medical Condition. However, the patient is never considered "stable for discharge: if within reasonable medical probability the patient's condition would materially deteriorate after discharge.

11.     The summary judgment evidence raises a fact issue on all of the following issues:

    a. Failing to provide Jessie Holt with the same medical screening examination that it would provide to all patients presenting in its emergency department in the same or similar circumstances;

    b. Failing to provide Jessie Holt with such further medical examination and such treatment as may be required to stabilize the medical condition to after the "Hospital" determined that Jessie Holt was suffering from an emergency medical condition; and

   c. Failing to stabilize Jessie Holt for discharge by failing to give him a plan for appropriate follow-up care with his discharge instructions.

12.     It is undisputed that on January 11, 2016, the "Hospital" operated a hospital with an emergency department, staffed with nurses and physicians.  It is undisputed that on January 11, 2016, Jessie Ross Holt was brought to that emergency department in an ambulance with a medical condition and chief complaint that he was a forty-four year old male with a severe aortic stenosis who had been working out on a treadmill at 24 Hour Fitness when he passed out and fell to the ground, that he started turning blue, that his arms curled up, that he was provided cardiopulmonary resuscitation (CPR), and that after a few minutes he became awake but that he was confused about what was going on.  A request was made on his behalf for medical examination and treatment.

13.     It is undisputed that Evan Tow, D.O. was the "Hospital's" assigned physician in its emergency department on January 11, 2016 who was assigned to provide Jessie Holt with the care required by EMTALA.  It is undisputed that Dr. Tow and the "Hospital's" emergency department crew had actual knowledge that Jessie Holt's medical condition and chief complaint was that he was a 44 year old male laying supine on the ground at 24 Hour Fitness, that per the staff he was running on a treadmill, he passed out and started turning blue and his arms curled up.  A 24 Hour Fitness employee started CPR (cardiopulmonary resuscitation), that after a few minutes the 24 Hour Fitness employee(s) stated that Jessie Holt became awake but confused. The EMS personnel communicated that information to the emergency room personnel on Jessie Holt's arrival by ambulance at the "Hospital's" emergency department.   The triage nurse documented[18] the history, including that Jessie Holt had been provided with CPR and she testified that what she documented was important in the emergency room.

---

[18]  Appendix Exhibit 9, Hospital's medical chart on Jessie Holt at page 48 & 63 and Appendix Exhibit 5, deposition of Christina Hamlyn, R.N 18.4 -19.3

14     It is undisputed that Jessie Holt was suffering from an emergency medical condition.[19] With Jessie Holt's known medical condition of severe aortic stenosis and his documented presenting chief complaint, which included that he was revived with CPR, the "Hospital" would have worked him up as a cardiac arrest, the "Hospital" would have admitted him to the hospital, and the "Hospital" would have arranged for him to have a consultation with a cardiologist.[20] It is undisputed that Dr. Tow was so concerned about Jessie Holt, who had known severe aortic stenosis and who had just had a syncopal episode while exercising, that Dr. Tow believed that Jessie Holt needed to be seen immediately by a cardiologist.[21]

15.    It is undisputed that Dr. Tow was very busy and had forty patients to take care of at the time in question and that he had been called in to help out in the emergency department.[22] Being too busy is not an excuse for failing to comply with EMTALA.

16.    It is undisputed that Dr. Tow informed Jessie Holt and his wife that all that was wrong with him was that he was dehydrated, that he was discharged from the "Hospital" after less than two hours, that he was given discharge instructions related to dehydration, and that he was given no discharge instructions related to Dr. Tow's concern that Jessie Holt needed an immediate consultation with a cardiologist on account that Jessie Holt had severe aortic stenosis and a syncopal episode.

17.    There is summary judgment evidence that Dr. Tow believed that Jessie Holt was stabilized and able to receive treatment elsewhere as an outpatient and for that reason, Dr. Tow discharged Jessie Holt with discharge instructions that he was just dehydrated.  That summary judgment evidence means that Plaintiffs do not have to prove that the "Hospital" acted with willful and

---

[19] Appendix Exhibit 4, Deposition of Evan Tow, D.O. 7.25 - 8.14 and 80.4 – 80.11
[20] *Id.* at 29.10 – 30.6, 39.9 – 23, 70.21 – 71.6
[21] *Id.* 80.25 – 82.13
[22] *Id.* at 73.14 – 25, 72.15 – 18 and 10.3 - 16

wanton negligence, because Jessie Holt was, in the opinion of Dr. Tow, stabilized and capable of receiving medical treatment as a non-emergency patient.[23]

18.     The summary judgement evidence raises a fact issue on the allegations that Evan Tow, D.O. was either an ostensible agent or an apparent agent of the "Hospital."

19.     Plaintiffs are contemporaneously filing a Brief in Support of this Opposition and Response and Appendix.

20.     For the foregoing reasons, Plaintiffs respectfully request that this Court deny St. Luke's Health System, doing business as CHI St. Luke's Patients Medical Center, PMC Hospital, L.L.C., doing business as Chi St. Luke's Patients Medical Center, Motion for Summary Judgment. (Document No. 36), in its entirety.

WHEREFORE. PREMISES CONSIDERED, Plaintiffs respectfully pray that Movants' motion for summary judgment be denied and for any such further and other relief to which they may be justly entitled.

                                                  Respectfully submitted,
                                                  **THE ONSTAD LAW FIRM**

By: _____
        ROCKNE W. ONSTAD
        State Bar No. 15291000
        Southern District Federal I.D. No. 7074
        119 Ranch Road 620 South
        Austin, Texas  78734
        Telephone (512) 263-7600
        Facsimile (512) 263-7800
        E-mail  rock@onstadlaw.com

        **ATTORNEYS FOR PLAINTIFFS**

---

[23] Appendix Exhibit 9, Hospital's medical chart on Jessie Holt at pages 10, 38, 46 and 47; Texas Civil Practice and Remedies Code § 74.001 (a)(7) and § 74.151 and § 74.153, and *Guzman v. Mem'l Hermann Hosp. Sys.,* 2009 U.S. Dist. LEXIS 23445, page 38.

**CERTIFICATE OF SERVICE**

    I certify that on 6th day of December, 2017, a true and correct copy of the above and foregoing instrument was served on the following counsel of record in accordance with Fed.R.Civ.P 5(b)(2)(E) and L.R. 5.1.

| | |
|---|---|
| Frank N. Luccia<br>SBN 12664400<br>SDBN 10384<br>fnluccia@luccia-evans.com<br>Lauren M. Virene<br>SBN 24087980<br>SDBN 2166180<br>lvirene@luccia-evans.com<br>Luccia & Evans, L.L.P.<br>8 Greenway Plaza, Suite 1450<br>Houston, Texas 77046<br>(713) 629-0002<br>Fax (713) 629-0004<br><br>**ATTORNEYS FOR DEFENDANTS ST. LUKE'S HEALTH SYSTEM, DOING BUSINESS AS CHI ST. LUKE'S PATIENTS MEDICAL CENTER AND PMC HOSPITAL, LLC DOING BUSINESS AS CHI ST. LUKE'S PATIENTS MEDICAL CENTER** | James R. Boston<br>Texas Bar No.: 02681200<br>Southern District Federal ID: 3323<br>Email: jboston@bostonhughes.com<br>Gary Sommer<br>Texas Bar No.: 24010415<br>Southern District Federal ID: 2646895<br>Email: gsommer@bostonhughes.com<br>Boston & Hughes, PC<br>8584 Katy Freeway, Suite 310<br>Houston, Texas 77024<br>Facsimile: 713-965-0883<br><br>**Attorneys for Defendants Kevin A. Lisman, MD and Houston Cardiovascular Associates**<br><br>John S. Serpe<br>Federal Bar No. 4741<br>Texas Bar No. 18037400<br>jserpe@serpejones.com<br>Serpe Jones Andres Callender & Bell, P.L.L.C.<br>America Tower<br>2929 Allen Parkway, Ste. 1600<br>Houston, Texas 77019<br>Telephone: 713-452-4400<br>Facsimile: 713-452-4499<br><br>**Attorneys for Defendants Evan B. Tow, D.O. and Tue Nguyen, M.D.** |

_____
ROCKNE W. ONSTAD