# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **KELLY HOLT, ET AL** | § | |
| | § | |
| | § | |
| **PLAINTIFFS** | § | |
| | § | **No.4:16-cv-02898** |
| | § | |
| **vs.** | § | |
| | § | |
| | § | |
| **ST. LUKE'S HEALTH SYSTEM, DOING** | § | |
| **BUSINESS AS CHI ST. LUKE'S** | § | |
| **PATIENTS MEDICAL CENTER, ET AL** | § | **JURY TRIAL DEMANDED** |
| | § | |
| | § | |
| **DEFENDANTS** | § | |
| | § | |

**BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' ST. LUKE'S HEALTH SYSTEM D/B/A CHI ST. LUKES PATIENTS MEDICAL CENTER AND PMC HOSPITAL, LLC D/B/A CHI ST. LUKE'S PATIENTS MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT (DOCUMENT 36)**

---

THE ONSTAD LAW FIRM

**By:** _Rockne W. Onstad_
_____

**ROCKNE W. ONSTAD**
**Attorney in Charge**
**State Bar No. 15291000**
**Southern District Fed ID No. 7074**
**119 Ranch Road 620 South**
**Austin, Texas  78734**
**Telephone (512) 263-7600**
**Facsimile (512) 263-7800**

**ATTORNEY FOR PLAINTIFFS**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITES                                         3

NATURE AND STAGE OF PROCEEDINGS                            4

ISSUES PRESENTED                                           5

SUMMARY OF ARGUMENT                                        5

EXHIBITS & EVIDENCE                                        7

SUMMARY OF THE SUMMARY JUDGMENT EVIDENCE                   7

ARGUMENT AND LEGAL AUTHORITIES                            19

CONCLUSION                                                26

CERTIFICATE OF SERVICE                                    29

## TABLE OF AUTHORITIES

**Federal Cases:**

*Battle v. Memorial Hospital at Gulfport*
  228 F.3d 544, 557, 558 (5th Cir. 2000).       23, 24

*Celotex Corp. v. Catrett*
  477 U.S. 317, 322 (1986);106 S.Ct; 2548; 91 L.Ed. 265  19, 20

*Cleland v. Bronson Health Care Group*
  917 F.2d 266,269 (6th cir. 1990)         23

*Cooper Tire & Rubber Co. v. Farese*
  423 F.3d 446, 455-56 (5th Cir. 2005)       20

*Correa v. Hospital San Francisco*
  69 F.3d 1184, 1192-1193 (1st Cir. 1995)     22

*Feighery v. York Hosp.*
  38 F. Supp. 2d 142, 158 (D.C. Me. 1999)    24

*Garcia v. Pueblo Country Club*
  299 F.3d 1233, 1236-37 (10th Cir. 2002)     20

*J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*
  73 F.3d 1245, 1251 (1st Cir. 1996)       19

*Guzman v. Mem'l Hermann Hosp. Sys.*
  637 F. Supp. 2d 464, 493, 505 (S.D. Tex. 2009)  22, 23, 24

*Guzman v. Mem'l Hermann Hosp. Sys.*
  2009 U.S. Dist. LEXIS 23445        17

**State Court Cases:**

*Baptist Mem. Hosp. Sys. v. Sampson*
969 S.W.2d 945 (Tex. 1997)          25

**State Statutes:**

*TEX. CIV. PRAC. & REM. CODE. § 74.001(a)(7); §74.151 and § 74.153* 17, 25, 26

**Federal Statutes**

*42 U.S.C. §§ 1395dd(b)(1)(A) & (B)*       20

**Federal Rules:**

Fed. R. Civ. P. R. 56            19

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **KELLY HOLT, ET AL** | § | |
| | § | |
| | § | |
| **PLAINTIFFS** | § | |
| | § | **No.4:16-cv-02898** |
| | § | |
| **vs.** | § | |
| | § | |
| | § | |
| **ST. LUKE'S HEALTH SYSTEM, DOING** | § | |
| **BUSINESS AS CHI ST. LUKE'S** | § | |
| **PATIENTS MEDICAL CENTER, ET AL** | § | **JURY TRIAL DEMANDED** |
| | § | |
| | § | |
| **DEFENDANTS** | § | |
| | § | |

**BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' ST. LUKE'S HEALTH SYSTEM D/B/A CHI ST. LUKES PATIENTS MEDICAL CENTER AND PMC HOSPITAL, LLC D/B/A CHI ST. LUKE'S PATIENTS MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT (DOCUMENT 36)**

To the Honorable United States District Judge Lee H. Rosenthal:

Plaintiffs ask the Court to deny Defendants St. Luke's Health System, d/b/a CHI St. Luke's Patients Medical Center and PMC Hospital, LLC d/b/a Patients Medical Center's Motion for Summary Judgment (Document No. 36), and in support thereof, Plaintiffs show as follows

**NATURE AND STAGE OF PROCEEDINGS**

1.      Plaintiffs are Kelly Holt, individually, Jedidiah Holt, Individually, Georgia Dean, as Next Friend of J.R.H., a minor, and James Richard Holt, Independent Executor of the Estate of "Holt", Deceased and defendants are St. Luke's Health System, d/b/a CHI St. Luke's Patients Medical Center, PMC Hospital, L.L.C., d/b/a Chi St. Luke's Patients Medical Center (hereinafter

collectively referred to as the "Hospital"), Kevin A. Lisman, M.D., Houston Cardiovascular Associates, and Evan B. Tow, D.O.

2.      Plaintiffs have sued the "Hospital" for wrongful death and survival damages claiming, inter alia, that its violations of 42 USCS § 1395dd (EMTALA) on January 11, 2016 caused the premature death of Jessie Holt on April 8, 2016 (Document 19).

3.      Discovery is ongoing with the depositions of the Defendants' designated expert witnesses currently scheduled to take place between the 13th and 21st of December, 2017, and mediation is scheduled by agreement of all parties for January 18, 2018.

## ISSUES PRESENTED

4.      The following issues are presented in this brief:

a.      Whether the summary judgment evidence raises a fact issue that the "Hospital" failed to provide Jessie Holt with an appropriate medical screening examination, and/or to properly stabilize him for discharge;

b.      Whether or not the willful and wanton negligence standard applies in this case; and

c.      Whether the summary judgment evidence raises a fact issue on Plaintiffs' claim that Evan Tow, D.O. was the ostensible agent and/or the apparent agent of the "Hospital".

## SUMMARY OF THE ARGUMENT

5.       Plaintiffs' summary judgment evidence raises a fact issue on each ground Movants have asserted in their motion for summary judgment:

a.      That the "Hospital" failed to provide Jessie Holt with an appropriate medical screening examination in accordance with its own policy and procedure and  that it failed to properly stabilize him for discharge;

b.      That the willful and wanton negligence standard does not apply in this case because there is evidence that the "Hospital's" emergency room physician documented

that Mr. Holt was stable for discharge and no longer continuing to suffer from an emergency medical condition; and

c.      That Evan Tow, D.O. was the ostensible agent or the apparent agent of the "Hospital" because the "Hospital" placed Dr. Tow in its emergency room, Mr. Holt did not choose Dr. Tow, Dr. Tow did not inform Mr. Holt that he was an independent contractor and not an employee of the "Hospital," there were no signs in the "Hospital" informing anyone that Dr. Tow was an independent contractor and not an employee of the "Hospital," the "Hospital" provided Dr. Tow with a photo-identification name badge that he was wearing that would cause any reasonable person to believe that he was an employee of the "Hospital," and that Dr. Tow's office and telephone number was the same as the "Hospital's."

6.      Additionally, Plaintiffs' summary judgment evidence raises a fact issue as to each liability allegation contained in Plaintiffs' First Amended Original Complaint (Document 19), that the "Hospital" violated EMTALA and its own policy and procedure for complying with EMTALA by

a.  failing to provide Jessie Holt with the same medical screening examination that it would provide to all patients presenting in its emergency department in the same or similar circumstances;

b.  failing to provide Jessie Holt with such further medical examination and such treatment as may be required to stabilize that medical condition after its emergency room physician determined that Jessie Holt was suffering from an emergency medical condition; and

c.  failing to stabilize him for discharge by failing to give him a plan for appropriate follow-up care with his discharge instructions

## EXHIBITS & EVIDENCE

7.      This brief is based on the pleadings and discovery on file in this case and the following

exhibits which are submitted in an appendix filed contemporaneously herewith and incorporated

herein by references:

> (1)      Affidavit of Rockne W. Onstad, Appendix Exhibit 1.
>
> (2)      Excerpts from deposition of John MacGregor, M.D., Ph.D., Appendix Exhibit 2.
>
> (3)      Affidavit of John MacGregor, M.D., Ph.D., Appendix Exhibit 3.
>
> (4)      Excerpts from deposition of Evan Tow, D.O., Appendix Exhibit 4.
>
> (5)      Excerpts from deposition of Christina Hamlyn, R.N., Appendix Exhibit 5
>
> (6)      Affidavit of Elbert Delacruz, R.N., Appendix Exhibit 6
>
> (7)      Excerpts from deposition of Jason Case, R.N., Appendix Exhibit 7
>
> (8)      Name Badges of Elbert Delacruz, R.N. and Evan Tow, D.O., Appendix Exhibit 8.
>
> (9)      Medical Records from Patients Medical Center, Appendix Exhibit 9.
>
> (10)     Patients Medical Center policy and procedure, Appendix Exhibit 10

## SUMMARY OF THE SUMMARY JUDGMENT EVIDENCE

8.      The "Hospital" had in place a policy and procedure entitled "*Medical Screening,*

*Stabilization and Transfer of Individuals with Emergency Medical Conditions*" and it applied to

Mr. Holt.[1]  That policy and procedure provided in part as follows:

> *Any patient who comes to the facility requesting an examination or treatment for*
>
> *a medical condition must be provided with an appropriate medical screening*
>
> *examination to determine if the patient is suffering from an Emergency Medical*
>
> *Condition, and, and if it is determined that the that the individual has an*
>
> *Emergency Medical Condition, to provide the individual with such further medical*
>
> *examination and treatment as required to stabilize the Emergency Medical*

---

[1]  Appendix Exhibit 10  the "Hospital's" EMTALA compliance Policy and Procedure and Appendix Exhibit 7 Deposition of Jason Case, R.N. at 56.14 to 56.22

*Condition, within the capability of Patients Medical Center, or to arrange for transfer of the individual to another medical facility in accordance with the procedures set forth before.*

*Medical Screening Examination – the process required to determine, with reasonable clinical confidence, whether an Emergency Medical Condition does or does not exist.  It is an ongoing process and must reflect continued monitoring according to the patient's needs and must continue until he/she is stabilized or appropriately transferred.  The exam will include information about the chief complaint, the patient's vital signs, mental status assessment, general appearance, and a <u>focused exam related to the patient's complaint</u>.  Note: Triage is not the equivalent of a medical screening exam.  Physician and/or qualified licensed Allied Health Professional are the only profession approved to complete a medical screening examination at Patients Medical Center.*"

*Individuals Who Have An Emergency Medical Condition*

*a.  When it is determined that the individual has an Emergency Medical Condition, Patients Medical Center shall:*

*i.  Within the capability of the staff and facilities at Patients Medical Center, stabilize the individual to the point where the individual is either "stable for discharge" or "stable for transfer," as defined in Section IV.G and Section IV.H.*

*To "stabilize" or "stabilize" or "stabilized" means:*

*With respect to an Emergency Medical Condition, that the individual is provided with such medical treatment as is necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the patient from Patients Medical Center.*

*Stable for discharge means:*

*The physician has determined within reasonable clinical confidence, that the patient has reached the point where his/her continued medical treatment, including diagnostic work-up or treatment, could reasonably be performed as an outpatient or later as an inpatient, <u>as long as the patient is given a plan for appropriate follow-up care with discharge instructions</u>.*

*Note:  "Stable for discharge does not require the final resolution of the Emergency Medical Condition.  However, the patient is never considered stable for discharge: if within reasonable medical probability the patient's condition would materially deteriorate after discharge.*

9.      The policy and procedure applied to Mr. Holt and every other person who showed up in the "Hospital's" emergency department.[2]  The medical screening examination required by the policy and procedure required that the examination be focused on the patient's chief complaint.[3] In this case the most important fact in Mr. Holt's chief complaint was that he required cardio-pulmonary (CPR) resuscitation to revive him after he had passed out and started turning blue. The reason that the fact of CPR has become the most important fact and element of Mr. Holt's presenting medical condition and chief complaint is because Dr. Tow testified that had he known about the CPR, he would have called an internist to admit Mr. Holt with a cardiology consult.[4]  Because of Dr. Tow's claim that he did not know about the CPR, Dr. Tow discharged Mr. Holt and told Mr. Holt and his wife that Mr. Holt was only dehydrated.[5]

10.     Appendix Exhibit 10 is the "Hospital's" policy for medical screening, stabilization and transfer of individuals with emergency medical conditions and it applied to Mr. Holt.[6]  It defines what a medical screening examination is and Mr. Holt was entitled to such a medical screening

---

[2]  Appendix Exhibit 7 Deposition of Jason Case, RN 56.14 – 56.22 and Appendix Exhibit 4 Deposition of Evan Tow, D.O. 91.5 – 91.9
[3]  Appendix Exhibit 6 deposition of Elbert DelcCruz, R.N. 42.12 – 43.3
[4]  Appendix Exhibit 4 Deposition of Evan Tow, D.O. 29.10 – 30.16; 39.9 – 23; and 70.21 – 71.6
[5]  *Id.* at 75.4 – 76.5
[6]  Appendix Exhibit 7 deposition of Jason Case, RN) 56.16 -56.22

examination.[7]  It was the standard practice of the "Hospital" that when a patient comes in with

the condition and history that Mr. Holt came in with that a careful history is required.[8]  The

history that the emergency department was given was that Mr. Holt's complaint was that he

passed out while jogging on a treadmill at 24 Hour Fitness, that he started turning blue, that his

arms started curling up, and that he required CPR.[9]

11.     On January 11, 2016, Mr. Holt was brought to the Hospital's emergency department in

an ambulance and a request was made on his behalf that the Hospital provide him with an

examination or treatment for a medical condition.[10]  The Policy and Procedure applied to any

patient and to Mr. Holt.[11]  The Policy and Procedure requires that every patient's medical

screening examination include information about the patient's chief complaint and that the

patient gets a focused physical exam related to the patient's complaint.[12]

12.     Mr. Holt's medical condition in question and his chief complaint was that while working

out on a treadmill at 24 Hour Fitness, he passed out, fell to the floor, started turning blue, and

required cardiac CPR to revive him.[13]

13.     The information about Mr. Holt's chief complaint was communicated to the Hospital's

emergency department crew by the emergency medical services technicians who brought Mr.

Holt to the emergency department.  The chief complaint was "Pt laying supine on the ground at

24 Hour Fitness.  Per staff, the patient was running on a treadmill, passed out, fell.  And they

state the patient started to turn blue and his arms curled up.  A 24 Hour Fitness employee

started CPR.  They stated after a few minutes the patient became awake but confused.  Upon

assessment, the patient is awake and will look at me and say his name.  The patient seems

---

[7]  *Id.* at 57.24 – 58.7
[8]  *Id.* at 59.11 – 59.21
[9]  *Id.* at 74.11 – 74.20
[10]  Appendix Exhibit 6 Deposition of Elbert DeLaCruz, R.N. 31.12 – 32.16
[11]  Id.
[12]  Id. at 42.5 – 43.3
[13]  Appendix Exhibit 6 Deposition of Elbert DeLaCruz, R.N 32.1 -16

confused about what happened and what was going on." That is the history that would have been communicated to the personnel in the ER on the patient's arrival.[14]

14.     The approach to a patient in the emergency department is teamwork: the nurses are supposed to be taking history and communicating the history to the physician. The nurses knew and documented that Mr. Holt had CPR performed on him. Dr. Tow testified the nurses should have informed him that Mr. Holt had CPR performed on him, but that the nurses did not communicate that to him.[15]

15.     The triage nurse documented in the triage note[16] that bystanders had performed CPR on Mr. Holt before he came in because that is an important fact and that is why she documented it.[17]

16.     Dr. Tow's  testimony that if he had known about Mr. Holt being revived by CPR that Mr. Holt would have been worked up as a post cardiac arrest patient, that he would have been admitted to the hospital into the attendance of an internist, and that a consultation with a cardiologist would have been arranged,[18] makes it clear that the key and most important fact in the chief complaint and medical condition was the fact that Mr. Holt required CPR to revive him.[19] Dr. Tow admitted that it was his responsibility to know that.[20] Dr. Tow's admission that if he had known about the CPR it would have been a different ball game[21] and that he would have admitted Mr. Holt and recommended a cardiology consult,[22] again emphasizes what an important fact of the chief complaint the CPR was. Even though Dr. Tow testified in his deposition that he did not know of the CPR, there is evidence that he did know. There is evidence everyone on the emergency department crew knew about the CPR. Dr. Tow also

---

[14]  Appendix Exhibit 7 Deposition of Jason Case, R.N. at 20.17 – 21.4
[15]  Appendix Exhibit 4 Deposition of Evan Tow, D.O. 44.18 – 45.19
[16]  Appendix Exhibit 9 the "Hospital's" chart January 11, 2016 on Jessie Holt at p. 48
[17]  Appendix Exhibit 5 Deposition of Christina Hamlyn, R.N. 10.16 – 19.3
[18]  Appendix Exhibit 4 Deposition of Evan Tow, D.O. at 24:4 -22; 29:10 – 30:16; 39:9 – 23; and 70:21 – 71:6
[19]  Appendix Exhibit 5 Deposition of Christina Hamlyn, R.N. at 18.16 – 19.3
[20]  Appendix Exhibit 4 Deposition of Evan Tow, D.O. at 38.4 - 12
[21]  *Id.* at 64.14 – 65.20
[22]  *Id.* at 39.9 - 23

admitted he talked to the EMS personnel.  The history and chief complaint information was given to the emergency room personnel by the EMS crew because Mr. Holt was unable to provide such history.

17.     Dr. Tow admitted that an appropriate medical screening examination could not be provided if he did not have all of the available facts in front of him.[23]  The evidence raises a fact issue that everyone in the emergency department knew about the CPR, including Dr. Tow.

18.     The medical chart created by the "Hospital" documented that the "Hospital's" emergency room physician, Evan Tow, D.O., evaluated Mr. Holt, and determined that Mr. Holt was only suffering from dehydration, and that Dr. Tow discharged Mr. Holt after Mr. Holt had been in the emergency department for approximately one hour and forty-five minutes, telling Mr. Holt and Mr. Holt's wife that Mr. Holt was only dehydrated.[24]

19.     Dr. Tow testified that he conversed with the EMS crew[25] and that it was his responsibility to know that after Mr. Holt had passed out that he started turning blue and was provided with CPR.[26]

20.     Dr. Tow testified that he was very concerned about Mr. Holt working out with a severe aortic stenosis and that he believed that Mr. Holt should have had an immediate consultation with his cardiologist.[27]  There is no such concern documented in the Hospital's chart.  It is undisputed that Dr. Tow failed in his responsibility to know a very important fact about the presenting chief complaint and history, and that had he known that Mr. Holt had been provided with CPR, Mr. Holt would have been admitted into the care of a cardiologist and not discharged being told he was only dehydrated.

21.     The "Hospital" failed to provide Mr. Holt with the appropriate medical screening examination and/or such further medical screening examination required by its policy and

---

[23] *Id.* at 87.14 – 87.19
[24] Appendix Exhibit 4 Deposition of Evan Tow, D.O. 75.4- 75.17
[25] Id. at 25.7 – 25.12
[26] Id. at 38.4 – 38.12
[27] Id. at 80.25 – 82.13

procedure to provide him with a focused exam related to his chief complaint.  Such focused

exam would have been to admit Mr. Holt into the hospital in the care of an internist and with a

cardiology consultation.  Mr. Holt was denied a focused medical exam related to his requiring

CPR to revive him after he had passed out and started turning blue.

22.     Dr. Tow admitted that Mr. Holt had an emergency medical condition.[28]  The "Hospital"

did not provide Mr. Holt such further medical examination and treatment as required to stabilize

the Emergency Medical Condition, but discharged him telling him that he was only dehydrated

and providing him only discharge instructions related to dehydration.  It is undisputed that Mr.

Holt was not worked up as a cardiac arrest, that he was not admitted to the hospital, that a

cardiology consultation was not recommended or arranged, and that Mr. Holt was not informed

by Dr. Tow that Dr. Tow was so concerned about Mr. Holt having severe aortic stenosis and

having a syncope episode that he needed an immediate consultation with a cardiologist.[29]

23.     The bottom line is that Dr. Tow knew Mr. Holt had an emergency medical condition, that

Mr. Holt should not have been working out with a severe aortic stenosis, and that Dr. Tow

believed that Mr. Holt should have had an immediate consultation with his cardiologist.[30]  With

such actual knowledge and belief, Mr. Holt was sent home and told he was only dehydrated.

24.     Dr. Tow knew that Mr. Holt needed to be admitted and seen immediately by a

cardiologist,[31] but Dr. Tow discharged Mr. Holt and told him and his wife that Mr. Holt was only

dehydrated.

25.     There are two explanations for why Mr. Holt did not get a focused physical exam related

to his chief complaint and medical condition.  One explanation was because Dr. Tow

incredulously claimed that he did not know the very important part of the chief complaint:  that

---

[28]  *Id.* at 19.9 – 19.12
[29]  Appendix Exhibit 9 the "Hospital's" chart January 11, 2016 on Jessie Holt at pps 10, 46, 47, and 38 and Appendix
Exhibit 4 Deposition of Evan Tow, D.O. 75.4- 75.17
[30]  Appendix Exhibit 4 Deposition of Evan Tow, D.O. 75 80.25 – 82.13
[31]  *Id.*

Mr. Holt started turning blue and was provided CPR to revive him.  The other explanation was because Dr. Tow was too busy having to take care of forty patients[32] in the emergency department, and he just wanted to get Mr. Holt out the door as quickly as possible and with the least amount of effort.

26.     The affidavit and deposition testimony of John MacGregor, M.D., Ph.D. clearly and concisely summarizes the evidence and expresses his medical opinions that the "Hospital" failed to provide Mr. Holt with an appropriate medical screening examination.[33]

27.     The "Hospital" has relied heavily on the deposition testimony of John MacGregor, M.D., Ph.D., but it ignored and failed to inform the court that Dr. MacGregor testified as follows:

237.4 – 241.11

Q   Dr. MacGregor, I'm going to ask the videographer to zero in on the screen because it's got the definition of EMTALA.  It says:  "A medical screening requirement in the case of a hospital that has a hospital emergency department, if any individual comes to the emergency department and a request is made on the individual's behalf for an examination or a treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department to determine whether or not an emergency medical condition within the meaning of E1 exists."  Hold that, I'm going to go to another thing.  The hospital's policy, Plaintiff's Exhibit 2, says a medical screening examination -- and defines it as:  "The process required to determine, with reasonable clinical confidence, whether an emergency medical condition does or does not exist.  Is it an ongoing process and must reflect continued monitoring according to the patient's needs and

---

[32]  *Id.* at 10:3 - 16; 72:10 – 18; and 73:15 - 25
[33]  Appendix Exhibit 2 Deposition of John MacGregor, M.D, Ph at pps 214.2 – 8 and 237.24 – 240.7 and 3 at paragraph 8

must continue until he or she is stabilized or appropriately transferred.  The exam will include information abot the chief complaint, the patient's vital signs, mental status, assessment, general appearance and a focused exam related to the patient's complaint."  And this is what I believe the Court will instruct the jury on.  They'll be asked whether Patients Medical Center did --"Did Patients Medical Center fail to provide an appropriate medical screening examination after Jessie Holt came to the hospital's emergency department?  "Jessie Holt came to the hospital's emergency department -- if he presented to the hospital's emergency department seeking an examination of or treatment for a medical condition.  A medical screening examination means an examination within the capability of the hospital's emergency department including ancillary services routinely available to the emergency department to determine whether or not an emergency medical condition exists.  "An appropriate medical screening examination means a screening examination that is reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints."  <u>Here's my question</u>: In your opinion, with what I've just shown you, and assuming all that to be true, <u>have you formed an opinion as to whether or not Patients Medical Center failed to provide Mr. Holt an appropriate medical screening examination</u>?

A   Yes.

Q   What is your opinion?

A   That they failed to provide him with the appropriate medical screening exam.

* * *

Q   I think the Court may instruct the jury like this, and I'm going to assume -- I'm going to read it and I'm going to ask you to assume that this is the law that relates to the discharge:  "And did Patients Medical Center inappropriately discharge Jessie Holt

before Jessie Holt's emergency medical condition was stabilized?  An emergency medical condition was stabilized if any material deterioration of the condition was likely within reasonable medical probability to result from or occur during the transfer of the individual from the facility.  Patients Medical Center's discharge of Jessie Holt before the emergency medical condition responsible person acting on Jessie Holt's behalf was informed of the hospital's stabilization obligations, and the risks of discharge, and Jessie Holt requested a discharge in writing or Jessie Holt left Patients Medical Center facilities without the permission of any person employed by the hospital."  Assuming that definition, <u>have you formed an opinion whether or not Patients Medical Center inappropriately discharged Jessie Holt</u>?

A   Yes.

Q   What is your opinion?

A   That <u>they inappropriately discharged Mr. Holt.</u>

28.     Additionally, Dr. MacGregor authenticated his affidavit[34] as correctly stating his opinions, and in that affidavit at paragraph 8 he stated as follows:

"It is my opinion that Mr. Holt was not provided with an appropriate medical screening examination that is specified by EMTALA and hospital's policy and procedure to determine that an emergency medical condition did or did not exist because the medical screening examiner, Evan Tow, D.O. failed to have critically important information about Mr. Holt's chief complaint that after passing out on the treadmill that Mr. Holt started turning blue and that bystanders revived him with cardio-pulmonary resuscitation.  Dr. Tow testified it was his responsibility to have that information and that if he had that information, he would have worked Mr. Holt up as a cardiac arrest, he would have admitted Mr. Holt to the hospital and

---

[34]  Appendix Exhibit 3 at paragraph 8

recommended a consultation by a cardiologist.  The history that after passing out

while working out, Mr. Holt started turning blue and was provided cardio-

pulmonary resuscitation is extremely important history and as Dr. Tow's admitted

failure to know such history deprived Mr. Holt of a proper medical screening

examination.  An appropriate medical screening examination that would be

provided to ever patient who presented to the Hospital's emergency department

with the same presenting history and medical condition as Mr. Holt would include

the nurses and the physician knowing the pertinent history and medical condition

as provided by the emergency medical services personnel, that the patient after

passing out started turning blue, that bystanders provided the patient with CPR to

revive him.  The failure of that information to be known to the physician was a

failure of the Hospital to provide Mr. Holt with the same medical screening

examination (and further medical screening examination after determining that the

patient was suffering from an emergency medical condition) that it would have

provided to any patient who presented to its emergency department with the same

condition as Mr. Holt.

29.    With regard to the issue of the willful and wanton standard in the *Texas Civil Practice

*and Remedies Code* §74.151 and 153, this court addressed that issue in *Guzman v. Mem'l*

*Hermann Hosp. Sys.*, 2009 U.S. Dist. LEXIS 23445.[35]  In that case there was conflicting

evidence whether the physician had actual knowledge that the patient was suffering from a

bona fide emergency medical condition and whether that physician never perceived that the

patient was unstable and never treated the patient as unstable.  This court held that the

physician could not rely on the willful and wanton negligence standard found in § 74.153 of the

---

[35]  Appendix Exhibit 9, Hospital's medical chart on Jessie Holt at pages 10, 38, 46 and 47; Texas Civil Practice and Remedies Code § 74.001 (a)(7) and § 74.151 and § 74.153, and *Guzman v. Mem'l Hermann Hosp. Sys.,* 2009 U.S. Dist. LEXIS 23445, page 38; Appendix Exhibit 4, Deposition of Evan Tow, D.O. at 75.4 – 76.5

Texas Civil Practice and Remedies Code.  The summary judgment evidence shows that Dr. Tow gave testimony that he believed that Jessie Holt was stabilized and no longer suffering from an emergency medical condition.  The "Hospital" chart alone raises a fact issue on whether or not Jessie Holt was stabilized.  The evidence reflects that Dr. Tow was all over the place on what he did and what he believed.  The medical chart provides evidence that Dr. Tow believed Mr. Holt was stable and his action was to discharge Mr. Holt, telling Mr. Holt and his wife that he was only dehydrated.  The "Hospital" just cannot take a position that the willful and wanton standard applies when the medical chart shows otherwise.  The "Hospital" in its motion for summary judgment concedes that Jessie Holt was stabilized and no longer suffering from an emergency medical condition.

30.     Regarding the issue of ostensible agency and apparent agency, Dr. Tow was dressed in scrubs, and he was wearing name badge with his name, a photograph of him, and the "Hospital's" logo on the badge, and it was virtually identical to name badge the nurses had on.  He never told Mr. Holt he was not an employee of the hospital.  The location for his emergency physician group is at the hospital and the phone number for his group is the hospital's phone number.  The hospital furnished all the equipment, supplies and nurses.  When he showed up for first time, Mr. Holt was on a stretcher and lethargic. Dr. Tow had no idea if it would have been reasonable for Mr. Holt to believe he was an employee of the hospital.  The only reason he saw Mr. Holt is because the hospital put him in the emergency department and Mr. Holt arrived there by ambulance on a stretcher and he is the guy who showed up to take care of him.  The hospital holds itself out publicly as providing reasonably competent emergency room physicians.  The only place where he saw patients was at the hospital.[36]  The "Hospital's" claim that Jessie

---

[36]  *Id.* at 100.7 – 108.8

Holt signed a piece of paper acknowledging that Dr. Tow was an independent contractor is without any merit.  The evidence shows that Mr. Holt arrived at the "Hospital" at 1601, that he was registered at 1601, that triage was accomplished at 1603, and that the admission forms would have been signed by Mr. Holt at 1601.[37]  It is undisputed that when Mr. Holt was triaged at 1603 that he was postictal and that he was still groggy and slow to answer.[38]  It is obvious that the admission form that the "Hospital" relies on for its argument that Jessie Holt knew that Dr. Tow was an independent contractor could not be read by a normal person with full faculties in less than 3 minutes.  It is a sham that the "Hospital" attempts to rely on that document for the purpose of proving that Jessie Holt knew that Dr. Tow was an independent contractor.

## ARGUMENT AND LEGAL AUTHORITIES

31.     Although summary judgment is proper in a case in which there is no genuine issue of material fact, this is not such a case in which the Court should grant summary judgment.  Fed. R. Civ. P. R. 56(c).

32.     A defendant moving for summary judgment on Plaintiffs' claims must demonstrate the absence of a genuine issue of material fact either (1) submitting summary judgment evidence that negates the existence of a material element of Plaintiffs' claims or (2) showing there is no evidence to support an essential element of Plaintiffs' claims.  *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 73 F.3d 1245, 1251 (1st Cir. 1996);  see *Celotex Corp.* 477 U.S. at 322-23.  Defendant cannot rely on conclusory statements to establish that Plaintiffs have not presented evidence on an essential element of their claim.   Rather, defendant must

---

[37]  Appendix Exhibit 6 Deposition of Elbert Delacruz, R.N. 8.25 – 9.22
[38]  Appendix Exhibit 9 the "Hospital's" chart January 11, 2016 on Jessie Holt at page 48

demonstrate the absence of a genuine factual dispute.  See *Celotex Corp.* 477 U.S. at 324-25.

Only if defendant meets its burden is plaintiff required to respond by summary judgment proof to

show a genuine issue of material fact.  Fed. R. Civ. P. 56(e)(2).

33.     In determining whether there is a disputed issue of material fact that prevents summary

judgment, the Court must consider all evidence in the light most favorable to Plaintiffs as the

nonmovant.  *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1236-37 (10th Cir. 2002).  The court

must also resolve reasonable doubts about the facts in favor of Plaintiffs.  *Cooper Tire & Rubber*

*Co. v. Farese*, 423 F.3d 446, 455-56 (5th Cir. 2005).

34.     42 USCS § 1395dd.  Examination and treatment for emergency medical conditions and

women in labor (EMTALA)

(a) Medical screening requirement.  In the case of a hospital that has a hospital emergency

department, if any individual (whether or not eligible for benefits under this title [42 USCS §§

1395 et seq.]) comes to the emergency department and a request is made on the individual's

behalf for examination or treatment for a medical condition, the hospital must provide for an

appropriate medical screening examination within the capability of the hospital's emergency

department, including ancillary services routinely available to the emergency department, to

determine whether or not an emergency medical condition (within the meaning of subsection

(e)(1)) exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor.

(1) In general. If any individual (whether or not eligible for benefits under this title [42 USCS

§§ 1395 et seq.]) comes to a hospital and the hospital determines that the individual has an

emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical

examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection

(d)

(2)

(A) Personal harm. Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

(e) Definitions.  In this section:

(1) The term "emergency medical condition" means--

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part; or

(3) (A) The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

(B) The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

(d)  enforcement

  (2)  Civil Enforcement

    (A) Personal harm.  Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

35.     EMTALA requires that a hospital provide the patient with an appropriate medical screening examination.  A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination that is reasonably calculated to identify medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all patients who present with substantially similar complaints.  The essence of the screening requirement is that there is some screening procedure and that it be administered even-handedly. The same screening examination must be made available to all similarly situated patients.  *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1192-1193 (1st Cir. 1995).

36.     EMTALA requires a hospital to develop a policy or procedures for medical screening examinations.  *Guzman v. Mem'l Hermann Hosp. Sys., 637 F. Supp. 2d 464, 493 (S.D. Tex. 2009).*

37.     EMTALA does not define appropriate medical screening examination other than to state that its purpose is to identify an emergency medical condition.  Whether or not a medical screening is appropriate is determined by whether it was performed equitably in comparison to other patients with similar symptoms.  The plaintiff must proffer evidence sufficient to support a finding that he received materially different screening than that provided to others in his condition.  A hospital must provide a screening exam that is reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and must provide that level of screening uniformly to all those who present substantially similar complaints.  The plaintiff can meet this burden by

22

pointing to differences in the screening examination he received as compared to the examinations of other patients at that hospital who presented with similar symptoms, or by providing evidence that the hospital did not follow its own standard screening procedures. *Guzman v. Mem'l Hermann Hosp. Sys., 637 F. Supp. 2d 464, 481 (S.D. Tex. 2009).*

38.     The plaintiff can meet their EMTALA burden by providing evidence that the hospital did not follow its own standard screening procedures.  Evidence that hospital did not follow its own screening procedures can support finding of EMTALA liability for disparate treatment. *Battle v. Memorial Hospital at Gulfport, 228 F.3d 544, 558 (5th Cir. 2000).*

39.     The appropriate medical screening required by EMTALA for an emergency medical condition means the medical screening examination that the doctors on duty in the emergency department would provide for a condition within their actual knowledge that such doctors would have provided to any paying patient. *Cleland v. Bronson Health Care Group, 917 F.2d 266*, 269 (6th Cir. 1990).

40.     Under EMTALA, if a hospital detects an emergency medical condition, it must take measures to stabilize that condition before transferring or discharging the patient. "Stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility.  To stabilize means treatment that medical experts agree would prevent the threatening and severe consequence of the patient's emergency medical condition while in transit."  Stabilization is determined in reference to a patient's diagnosis, not what in hindsight a patient "turns out to have," and is evaluated at the time of discharge. The duty to stabilize arises when the hospital has actual knowledge that the patient has an unstabilized medical emergency.  The duty to stabilize arises when the hospital actually detects an emergency medical condition.  The duty to stabilize applies only after a hospital determines that an emergency medical condition exists.  The stabilization requirement obligates hospitals to stabilize conditions that they actually detect. *Guzman v. Mem'l Hermann Hosp. Sys.,*

*637 F. Supp. 2d 464, 502-503 (S.D. Tex. 2009).*

41.      If an emergency medical condition is readily apparent, EMTALA liability attaches for failing to stabilize.  Whether a patient is in fact suffering from an emergency medical condition is irrelevant for purposes of [EMTALA].  What matters is the hospital's determination of the patient's medical status. The standard is a subjective one. *Guzman v. Mem'l Hermann Hosp. Sys., 637 F. Supp. 2d 464, 504 (S.D. Tex. 2009).*

42.      Because hospitals can act and know things only vicariously through individuals, any EMTALA violation by physician who treats patients in fulfillment of his contractual duties with hospital is also a violation by hospital.  *Battle v. Memorial Hospital at Gulfport, 228 F.3d 544, 557 (5th Cir. 2000).*

43.      Plaintiffs must identify evidence from which a jury could conclude that the hospital had actual knowledge that the patient had an emergency medical condition and, if so, that the patient was not stabilized prior to discharge.  If the hospital has actual knowledge of the emergency medical condition, it must then provide either within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition.  Under EMTALA, to stabilize means to provide the patient with such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility.  *Battle v. Memorial Hospital at Gulfport, 228 F.3d 544, 558-559 (5th Cir. 2000).*

44.      Patient's widow can maintain claims under both state Wrongful Death Act and 42 USCS § 1395dd as alternative bases for holding hospital and physicians liable for patient's death. *Feighery v York Hosp.* 38 F Supp. 2d 142, 158 (1999, DC Me).

45.      A party asserting ostensible agency must demonstrate that (1) the principal, by its conduct, (2) caused him or her to reasonably believe that the putative agent was an employee or agent of the principal, and (3) that he or she justifiably relied on the appearance of agency.   Apparent

authority is based on estoppel. It may arise either from a principal knowingly permitting an agent to hold herself out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority she purports to exercise. A prerequisite to a proper finding of apparent authority is evidence of conduct by the principal relied upon by the party asserting the estoppel defense which would lead a reasonably prudent person to believe an agent had authority to so act. To establish a hospital's liability for an independent contractor's medical malpractice based on ostensible agency, a plaintiff must show that (1) he or she had a reasonable belief that the physician was the agent or employee of the hospital, (2) such belief was generated by the hospital affirmatively holding out the physician as its agent or employee or knowingly permitting the physician to hold herself out as the hospital's agent or employee, and (3) he or she justifiably relied on the representation of authority. Apparent authority in Texas is based on estoppel. It may arise either from a principal knowingly permitting an agent to hold herself out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise. A prerequisite to a proper finding of apparent authority is evidence of conduct by the principal relied upon by the party asserting the estoppel defense which would lead a reasonably prudent person to believe an agent had authority to so act. To establish a hospital's liability for an independent contractor's medical malpractice based on ostensible agency, a plaintiff must show that (1) he or she had a reasonable belief that the physician was the agent or employee of the hospital, (2) such belief was generated by the hospital affirmatively holding out the physician as its agent or employee or knowingly permitting the physician to hold herself out as the hospital's agent or employee, and (3) he or she justifiably relied on the representation of authority. *Baptist Mem. Hosp. Sys. v. Sampson, 969 S.W.2d 945, (Tex. 1997).*

46.     The Texas Civil Practice & Remedies Code, provides as follows:

§ 74.001

(7)  "Emergency medical care" means bona fide emergency services provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.  The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or that is unrelated to the original medical emergency.

§ 74.151. LIABILITY FOR EMERGENCY CARE.

(a) A person who in good faith administers emergency care, including using an automated external defibrillator, is not liable in civil damages for an act performed during the emergency unless the act is wilfully or wantonly negligent.

<u>CONCLUSION</u>

47.     The summary judgment evidence creates fact issue on all elements of Plaintiffs' causes of action alleged in Plaintiffs First Amended Original Complaint (Document 19) .

48.     The summary judgment evidence creates a fact issue on each of Movants' stated grounds in its motion for summary judgment.

49.     The summary judgment evidence raises a fact issue that everyone in the "Hospital's" emergency department, and thus the "Hospital," had actual knowledge that Mr. Holt's presenting medical condition and chief complaint included that after passing out on a treadmill and turning blue that Mr. Holt was revived by having CPR performed on him.  With that history of having been revived by CPR, the "Hospital's" emergency room physician would have worked Mr. Holt up as a cardiac arrest patient and admitted Mr. Holt to hospital under the care of an internist and recommended an immediate consultation with a cardiologist.  It is undisputed that instead of admitting Mr. Holt, Mr. Holt was discharged and told he was only suffering from dehydration.

50.     The "Hospital" determined that Jessie Holt was suffering from an emergency medical condition, and the summary judgment evidence raises a fact issue that it failed to provide him, within the staff and facilities available at the "Hospital," for such further medical examination and treatment as was required to stabilize the emergency medical condition within the meaning of 42 U.S.C.A. § 1395dd (b)(1)(A) or to transfer him to another facility within the meaning of 42 U.S.C.A. § 1395dd (b)(1)(B).

51.     The "Hospital's" argument that it is entitled to willful and wanton standard of proof fails because the summary judgment evidence, though conflicting, raises a fact issue that Mr. Holt was stable for discharge and that an emergency medical condition no longer existed.

52.     The summary judgment evidence raises a fact issue on the issue of both apparent agency and ostensible agency.  The "Hospital" did not move for summary judgment on apparent agency, but only ostensible agency.   The evidence is undisputed that Dr. Tow was placed in the emergency room by the "Hospital," that Mr. Holt did not choose Dr. Tow, that Dr. Tow did not inform Mr. Holt that he was an independent contractor and not an employee of the "Hospital," that there were no signs in the "Hospital" informing anyone that Dr. Tow was an independent contractor and not an employee of the "Hospital," that the "Hospital" provided Dr. Tow, and Dr. Tow was wearing, a photo identification name badge showing to any reasonable person that he was an employee of the "Hospital," and that Dr. Tow's office and telephone number was the same as the "Hospital's."  The "Hospital's" affirmative conduct of placing Dr. Tow in its emergency department with a photo identification name badge depicting him as an employee of the "Hospital," and it's providing to the public information that Dr. Tow's address and telephone number were the same as the "Hospital's," would lead an ordinarily prudent patient to reasonably believe that Dr. Tow was an employee of the "Hospital."  The "Hospital's" reliance on an admission form for the proposition that Mr. Holt was informed and knew that Dr. Tow was an independent contractor must fail because the undisputed evidence shows when such admission form was signed, it was between his arrival time at the "Hospital" and the time of triage (a 3 minute time

span).  The hospital records show Mr. Holt was in a postictal state, he was groggy and slow to answer, and that he was suffering from an emergency medical condition (a post cardiac arrest). No human being could read and understand such a document in a three minute time span in the condition Mr. Holt was in.

53.    For the foregoing reasons, Plaintiffs respectfully request that the Court deny Movants' Motion for Summary Judgment (Document No. 36) in its entirety.  Plaintiffs respectfully request any further and other relief to which they may be justly entitled.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs' pray that the court deny Movants' motion for summary judgment and grant such additional and further relieve to which Plaintiffs' are justly entitled.

Respectfully submitted,

THE ONSTAD LAW FIRM

By: _____

ROCKNE W. ONSTAD
Attorney in Charge
State Bar No. 15291000
Southern District Fed ID No. 7074
119 Ranch Road 620 South
Austin, Texas  78734
Telephone (512) 263-7600
Facsimile (512) 263-7800

**CERTIFICATE OF SERVICE**

I certify that on 6ᵗʰ day of December 2017, a true and correct copy of the above and foregoing instrument was served on the following counsel of record in accordance with Fed.R.Civ.P 5(b)(2)(E) and L.R. 5.1.

Frank N. Luccia
Texas Bar No. 12664400
Southern District Federal ID: 10384
fnluccia@luccia-evans.com
Lauren M. Virene
Texas Bar No. 24087980
Southern District Federal ID:  2166180
lvirene@luccia-evans.com
Luccia & Evans, L.L.P.,
8 Greenway Plaza, Suite 1450
Houston, Texas 78746
Telephone 713-629-0002
Facsimile 713-629-0004.

Attorneys for Defendants St. Luke's Health System, d/b/a CHI St. Luke's Patients Medical Center, PMC Hospital, L.L.C., d/b/a Chi St. Luke's Patients Medical Center

James R. Boston, Jr.
Texas Bar No. 02681200
Southern District Federal ID: 3323,
jboston@bostonhughes.com
Gary Sommer
Texas Bar No. 24010415
Southern District Federal ID: 2646895
gsommer@bostonhughes.com
8584 Katy Freeway, Suite 301
Houston, Texas 77024
Telephone 713-961-1122
Facsimile 713-965-0883

Attorneys for Kevin A. Lisman, M.D. and Houston Cardiovascular Associates.

John S. Serpe
Federal Bar No. 4741
Texas Bar No. 18037400
jserpe@serpejones.com
Serpe Jones Andres Callender & Bell, P.L.L.C.
America Tower
2929 Allen Parkway, Ste. 1600
Houston, Texas 77019
Telephone: 713-452-4400
Facsimile: 713-452-4498

Attorneys for Defendants
Evan B. Tow, D.O. and
Tue Nguyen, M.D.

_____
ROCKNE W. ONSTAD

29