UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KELLY HOLT, ET AL | § | |
| | § | |
| | § | |
| **PLAINTIFFS** | § | |
| | § | No.4:16-cv-02898 |
| | § | |
| vs. | § | |
| | § | |
| | § | |
| ST. LUKE'S HEALTH SYSTEM, DOING | § | |
| BUSINESS AS CHI ST. LUKE'S | § | |
| PATIENTS MEDICAL CENTER, ET AL | § | **JURY TRIAL DEMANDED** |
| | § | |
| | § | |
| **DEFENDANTS** | § | |
| | § | |

STATE OF CALIFORNIA          §
COUNTY OF SAN FRANCISCO   §

## AFFIDAVIT OF JOHN S. MACGREGOR, M.D., Ph.D.

Before me, the undersigned authority, personally appeared John S. MacGregor, M.D.,

Ph.D., who by me being duly sworn, deposed as follows:

I, the undersigned, am over 18 years of age, of sound mind, capable of making this

affidavit, and personally acquainted with the facts herein stated:

1.       My name is John S. MacGregor, M.D., Ph.D. I am a Professor of Medicine at University

of California at San Francisco School of Medicine, located in San Francisco, California. I am

the Director of the Cardiac Catheterization Laboratory at the San Francisco General Hospital. I

have board certification in Cardiovascular Diseases and Interventional Cardiology. My

curriculum vitae, which accurately sets forth my education, my post-doctoral training, my

academic appointments, my board certifications and dates, the professional organizations to

which I belong, extramural assignments, and a bibliography of publications which I have authored

or participated in is attached to this report, as Exhibit A. I am currently licensed to practice

medicine in the State of California.

Page **1** of **16**

# APPENDIX EXHIBIT 3

2.  This Affidavit is being prepared by me at the request of Rockne W. Onstad.

3.  Rockne W. Onstad has provided me with following materials related to Jessie Ross Holt:

- Medical Records from Patients Medical Center January 11, 2016 (Plaintiffs Exhibit 1)
- Medical Records from Southeast Cardiology (Plaintiffs Exhibit 5 and 11).
- Medical Records from Houston Cardiovascular Associates (Plaintiffs Exhibit 9).
- Medical Records from Michael Sweeney, M.D. (Plaintiffs Exhibit 10).
- Medical Records from Francois Ferron, M.D.
- Medical Examiner's Autopsy report (Plaintiffs Exhibit 8).
- Depositions and deposition exhibits of Kevin Lisman, M.D., Jason Case, R.N., Michael Sweeney, M.D., Elbert DeLaCruz, R.N., Evan Tow, D.O., Kelly Holt, and Rick Holt.
- EMTALA statute
- Patients Medical Center policy and procedure Medical Screening, Stabilization and Transfer of Individuals with Emergency Medical Conditions (Plaintiffs Exhibit 2).
- The American College of Emergency Physicians Clinical Policy: Critical Issues in Evaluation and Management of Adult Patients Presenting to the Emergency Department with Syncope. (Plaintiffs Exhibit 6).
- Emergency Medicine, 5th Ed., Tintinalli, M.D. chapter on Syncope (Plaintiffs Exhibit 4).
- 2014 AHA/ACC Guideline for the Management of Patients with Valvular Heart Disease: Executive summary (Plaintiffs Exhibit 7).
- Texas Medical Board Physician Profile – Evan Barnet Tow, D.O.
- Summary of pertinent facts (footnoted) Exhibit B attached to this affidavit.

4.  I have examined all the material listed in paragraph 3 above.

5.  Based upon my examination of the material listed in paragraph 3 above, and my education, training and experience set forth in my curriculum vitae, I have formed opinions regarding the medical and hospital services provided to Mr. Holt by Kevin Lisman, M.D. CHI St Luke's Patients Medical Center, and Evan B. Tow, D.O. All of the opinions stated by me in this affidavit are based upon reasonable medical probability.

6.  The summary of the pertinent facts with footnotes has been examined by me and I have cross checked the footnotes with the source, to determine the accuracy of the stated pertinent facts. I am of the opinion that the facts in that summary are accurate. I am relying on that statement of pertinent

APPENDIX EXHIBIT 3

facts, along with the sources that are footnoted, as a basis for my opinions that I am stating in this affidavit. The opinions that I am stating in this affidavit are based upon my education, training and experience set forth in this affidavit and in my curriculum vitae. The summary of pertinent facts is attached to this affidavit as Exhibit B and it is incorporated into this affidavit verbatim.

### OPINIONS WITH RESPECT TO CHI ST. LUKE'S PATIENTS MEDICAL CENTER COMPLIANCE WITH EMTALA

7.      It is my opinion that on January 11, 2016, when Mr. Holt presented to the hospital's emergency department he was suffering from an emergency medical condition as defined above in the EMTALA statute and the hospital's policy and procedure. That emergency medical condition was that Mr. Holt had a very severe aortic stenosis and that he suffered a syncope episode while exercising, which emergency medical condition was immediately life-threatening. The syncope episode was actually a cardiac arrest precipitated by Mr. Holt's very severe aortic stenosis. Mr. Holt's emergency medical condition was unstable, as it could precipitate another cardiac arrest at any moment, especially if Mr. Holt engaged in exertional activity. The only thing that would stabilize Mr. Holt's condition would be for Mr. Holt to have an aortic valve replacement operation. Additional stabilization would have been to advise Mr. Holt to refrain from exertional activity until after his aortic valve is replaced. When Mr. Holt was discharged from the emergency department he was not stable and he was not given appropriate follow-up care with the discharge instructions. Appropriate follow-up instructions would be to inform Mr. Holt that his syncope episode was most likely caused by his severe aortic stenosis, that he needed to be evaluated immediately by a cardiologist or cardiothoracic surgeon, and that he needed to refrain from any exertional activity.

8.      It is my opinion that Mr. Holt was not provided with an appropriate medical screening examination, that is specified by EMTALA and hospital's policy and procedure to determine that

### APPENDIX EXHIBIT 3

an emergency medical condition did or did not exist because the medical screening examiner,

Evan Tow, D.O. failed to have critically important information about Mr. Holt's chief complaint,

that after passing out on the treadmill that Mr. Holt started turning blue and that bystanders

revived him with cardio-pulmonary resuscitation. Dr. Tow testified it was his responsibility to

have that information and that if he had that information, he would have worked Mr. Holt up as a

cardiac arrest, he would have admitted Mr. Holt to the hospital and recommended a consultation

by a cardiologist. The history that after passing out while working out, Mr. Holt started turning

blue and was provided cardio-pulmonary resuscitation is extremely important history and Dr.

Tow's admitted failure to know such history deprived Mr. Holt of a proper medical screening

examination. An appropriate medical screening examination that would be provided to every

patient who presented to the Hospital's emergency department with the same presenting history

and medical condition as Mr. Holt would include the nurses and the physician knowing the

pertinent history and medical condition, as provided by the emergency medical services

personnel, that the patient after passing out started turning blue, that bystanders provided the

patient with CPR to revive him. The failure of that information to be known to the physician was

a failure of the Hospital to provide Mr. Holt with the same medical screening examination (and

further medical screening examination after determining that the patient was suffering from an

emergency medical condition) that it would have provided to any patient who presented to its

emergency department with the same condition as Mr. Holt.

9.    It is my opinion that when Mr. Holt was in the hospital's emergency department that he

was suffering from an emergency medical condition, as defined the EMTALA statute. Dr. Tow

admitted that Mr. Holt was suffering from an emergency medical condition.

10.    It is my opinion that the hospital failed to provide Mr. Holt with respect to the Emergency

Medical Condition, with such medical treatment as was necessary to assure, within reasonable

medical probability, that no material deterioration of the condition is likely to result. The hospital,

acting through Dr. Tow, should have admitted Mr. Holt to the hospital and arranged for a

Page **4** of **16**

APPENDIX EXHIBIT 3

consultation with a cardiologist. Dr. Tow admitted that Mr. Holt should have been admitted to the hospital and provided with an immediate consultation by a cardiologist.

11.     It is my opinion that when Mr. Holt was discharged from the hospital's emergency department that his medical condition was not stable. It was known to Dr. Tow that a patient with a very severe aortic stenosis who had a syncope spell while exercising was at risk to have another such syncope spell at any time which could be fatal. Mr. Holt's condition, at the time he was discharged, was that he could have another syncope episode caused by his severe aortic stenosis at any time, and that such a syncope spell could result in his death.

12.     It is my opinion that after Dr. Tow determined that Mr. Holt was suffering from an emergency medical condition, the hospital did not stabilize Mr. Holt, within the capability of the staff and facilities at Patients Medical Center, to the point that Mr. Holt was stable for discharge. It is my opinion that the only treatment that would stabilize Mr. Holt would be an aortic valve replacement, and advising Mr. Holt to refrain from exertional activity until after the aortic valve was replaced.

13.     It is my opinion that after Dr. Tow determined that Mr. Holt was suffering from an emergency medical condition, and discharged Mr. Holt, the hospital did not provide Mr. Holt with a plan for appropriate follow-up care with the discharge instructions. As Dr. Tow testified, Mr. Holt should have had an immediate consultation with his cardiologist, but Dr. Tow only informed Mr. Holt that all that was wrong with him was that he was dehydrated. There is no credible evidence that anyone advised Mr. Holt that he needed to be evaluated by his cardiologist immediately.

14.     It is my opinion that if Mr. Holt had been admitted to the hospital and evaluated by a cardiologist, that the cardiologist would have recommended an urgent aortic valve replacement, that Mr. Holt would have undergone an aortic valve replacement, and Mr. Holt would have lived a nearly normal life expectancy.

## APPENDIX EXHIBIT 3

15.     It is my opinion that if Dr. Tow had advised Mr. Holt to be evaluated immediately by a cardiologist on account of Dr. Tow's admitted concern that his severe aortic stenosis was related to his syncope spell, that the cardiologist would have recommended an urgent aortic valve replacement, that Mr. Holt would have undergone an aortic valve replacement, and Mr. Holt would have lived a nearly normal life expectancy.

16.     It is my opinion that Dr. Tow's advising Mr. Holt and his wife that all that was wrong with him was dehydration was clearly wrong, false, and misleading. Dr. Tow's advising Mr. Holt and his wife that all that was wrong with him was dehydration explains by Mr. Holt did not appreciate that his aortic stenosis had become very severe and symptomatic and that such advice kept Mr. Holt from having an immediate evaluation by a cardiologist.

17.     Dr. Tow admitted that he was concerned about Mr. Holt exercising with a severe aortic stenosis. Dr. Tow knew that Mr. Holt should be seen immediately by a cardiologist. However, Dr. Tow did not document or chart that he had any concern about Mr. Holt exercising with severe aortic stenosis or that he believed that Mr. Holt should be seen immediately by a cardiologist. That knowledge of Dr. Tow, and his failure to provide Mr. Holt with an immediate cardiologist consultation was a further failure to provide Mr. Holt with an appropriate medical screening examination specified by EMTLA and the hospital's policy and procedure "Medical Screening, Stabilization and Transfer of Individuals with Emergency Medical Conditions." Despite Dr. Tow's testimony that he did not know about the CPR, he did know that Mr. Holt had severe aortic stenosis and a syncope spell, that such a presenting history was a medical emergency, and that Mr. Holt should be seen immediately by a cardiologist. The record reflects that Dr. Tow did not document such knowledge and concern he had about Mr. Holt while Mr. Holt was in the emergency department. Such knowledge and concern show Dr. Tow had actual knowledge that Mr. Holt had a serious life threatening emergency medical condition, that Mr. Holt was not stable, and that Mr. Holt needed to be seen immediately by a cardiologist. Dr. Tow merely documented that Mr. Holt was dehydrated and discharged him after one hour and forty-

APPENDIX EXHIBIT 3

five minutes in the emergency department. Such conduct on the part of Dr. Tow was a gross violation of the requirements of the hospital's policy and procedure to provide Mr. Holt with an appropriate medical screening examination.

18.    Mr. Holt was not given a plan for appropriate follow-up care when he was discharged. Instructions for appropriate follow-up care would have informed Mr. Holt that his passing out and requiring CPR was likely related to his severe aortic stenosis, that he should be evaluated immediately by a cardiologist.

19.    The hospital, acting through its nurses and physicians, had actual knowledge that Mr. Holt arrived with a history consistent with a cardiac arrest. For every such patient, the hospital would provide such a patient with a medical screening examination to establish, with "reasonable medical confidence" that the patient did not have a cardiac arrest brought about by very severe aortic stenosis, or that his very severe aortic stenosis did not cause the patient to have a cardiac arrest. The "Medical Screening Examination" would be an ongoing process, and must reflect continued monitoring according to the patient's needs. Such examination included getting detailed information about the patient's chief complaint and a focused exam related to patient's chief complaint. Information about Mr. Holt's chief complaint would have included reviewing July 31, 2013 transesophageal-echocardiogram and communication with Mr. Holt's cardiologist, and learning that Mr. Holt's had very severe aortic stenosis that most likely precipitated the likely cardiac arrest that brought him to the emergency room. Such continued monitoring according to Mr. Holt's needs required that a cardiologist be summoned to evaluate Mr. Holt and that an echocardiogram be performed to assess the status of the very severe aortic stenosis. If the required medical screening examination been provided to Mr. Holt, it would have established and confirmed that his emergency medical condition was very severe aortic stenosis that precipitated a cardiac arrest. Such emergency medical condition meant that Mr. Holt was very unstable, and at high risk for another cardiac arrest that could be fatal. The only

thing that would stabilize Mr. Holt was for a surgical aortic valve replacement, either at CHI St. Luke's Patients Medical Center or another facility.

20.     I am of the opinion that on January 11, 2016, that Mr. Holt suffered a cardiac arrest while exercising that was precipitated by his severe aortic stenosis. The documented facts: that while exercising he lost consciousness, fell to the ground, started turning blue, his arms started curling up, that cardiopulmonary resuscitation was required to revive him, that he was groggy and in a postictal state after being revived is a classic cardiac arrest. With Mr. Holt's additional existing very severe aortic stenosis, it would be plainly evident and within the actual knowledge of the nurses and physicians in the emergency department that Mr. Holt's cardiac arrest was caused by his very severe aortic stenosis and that Mr. Holt's medical condition was an emergency and that Mr. Holt's condition was unstable. It was within the actual knowledge of the nurses and physicians in the emergency department that Mr. Holt could suffer another cardiac arrest at any moment, suddenly and without warning, which arrest could be fatal.

21.     I am of the opinion that if Mr. Holt been admitted to the hospital on January 11, 2016, and evaluated by a cardiologist, an echocardiogram would have been performed, that such echocardiogram would have shown that Mr. Holt had a very severe symptomatic aortic stenosis, and that it would have been recommended to Mr. Holt that he undergo an aortic valve replacement, and that Mr. Holt would have undergone a successful aortic valve replacement.

OPINIONS WITH RESPECT TO KEVIN LISMAN, M.D.

22     I have knowledge of the accepted standards of care that are applicable to Kevin Lisman, M.D. (board certified cardiologist) regarding the diagnosis, care and treatment of the illness, injury, or condition involved in this case, as reflected by the above listed materials that I examined. I have knowledge of acceptable standards of care for a cardiologist in attending to a patient like Jessie Holt during the period of time from 2013 to April 8, 2016. The treatment in question is the medical care that Kevin Lisman, M.D. provided to Mr. Holt between 2013 and April 8, 2016.

Page 8 of 16

APPENDIX EXHIBIT 3

23.    I have provided medical care to patients like Mr. Holt, on approximately over five
hundred occasions. I teach medical residents, emergency room residents and cardiology
fellows the proper method and standards of care for evaluating and providing such medical
care.

24.    You have asked me to use the Texas legal definitions of negligence and proximate
cause in formulating my opinions, and you have advised me that the Texas legal definition of
negligence for a physician such as Kevin Lisman, M.D. a board certified cardiologist, in
providing the medical treatment in question to Mr. Holt means, "the failure to use ordinary care;
that is, failure to do that which a board certified cardiologist of ordinary prudence would have
done under the same or similar circumstances, or doing that which a board certified cardiologist
of ordinary prudence would not have done under the same or similar circumstances" and that
ordinary care, when used with respect to the conduct of Dr. Lisman means "that degree of care
that a board certified cardiologist of ordinary prudence would use under the same or similar
circumstances." You have further advised me that the Texas legal definition of proximate cause
is, with reference to the conduct of Dr. Lisman, "that cause which, in a natural and continuous
sequence, produces an event, and without which cause such event would not have occurred. In
order to be a proximate cause, the act or omission complained of must be such that a board
certified cardiologist using ordinary care would have foreseen that the event, or some similar
event, might reasonably result there from." I believe that standard of care in this case is
synonymous with the degree of care that a board certified cardiologist of ordinary prudence
would use under the same or similar circumstances.

25.    I equate negligence in this case to conduct that is beneath accepted standards of care.
Whenever in this report I express an opinion that conduct is beneath accepted standards of
care, I am also saying that such conduct amounts to negligence.

26.    It is my opinion that Dr. Lisman acted negligently in providing medical care to Jessie
Holt, and that such negligence was a proximate cause of Mr. Holt's untimely death on April 8,

Page **9** of **16**

2016. More specifically, Dr. Lisman told his medical assistant on or about November 24, 2015 to inform Mr. Holt that Mr. Holt's November 2015 echocadiogram was unchanged from the November 2014 echocardiogram. Such information was false and misleading. Dr. Lisman should have explained to Mr. Holt that the November 2015 echocardiogram showed that Mr. Holt's aortic stenosis had worsened significantly. On January 12, 2016, Dr. Lisman was informed that Mr. Holt was running on a treadmill, that his heart started pounding and that he passed out, and that he went to the emergency room and was told he was dehydrated. Dr. Lisman had his medical assistant inform Mr. Holt that he should stay well hydrated and that if it happens again to call him. That information should have led Dr. Lisman to consider that Mr. Holt was now suffering from symptomatic very severe aortic stenosis. Dr. Lisman should have personally evaluated Mr. Holt. Such further evaluation of Mr. Holt by Dr. Lisman would have confirmed that Mr. Holt now had symptomatic very severe aortic stenosis. Dr. Lisman should then have recommended that Mr. Holt undergo aortic valve replacement as soon as possible. If such workup and evaluation had been provided to Mr. Holt, Mr. Holt most likely would have undergone an aortic valve replacement. Further, such failure misled Mr. Holt into believing it was safe for him to continue with his workout routine, when in fact such continued workout routine was extremely dangerous to Mr. Holt, as evidenced by the fatal cardiac arrest that Mr. Holt sustained on April 8, 2016.

27. It is my opinion that if Dr. Lisman had complied with the applicable standards of care, that Mr. Holt would have had an aortic valve replacement, and Mr. Holt would be living a nearly normal life with a normal life expectancy.


OPINIONS RELATED TO EVAN TOW, D.O.

28. I incorporate paragraphs 7 through 21 above, verbatim regarding the following opinions that I have regarding Evan Tow, D.O.

APPENDIX EXHIBIT 3

29.     I have had many occasions to evaluate patients in a hospital emergency department who have suspected issues related to cardiac disease. I have knowledge of accepted standards of care for a physician such as Evan Tow, D.O. in evaluating a patient like Mr. Holt in the same of similar circumstances. The medical literature stated in paragraph 3 above sets forth and states what an ordinarily prudent emergency medicine physician would do to evaluate a patient who presents in and emergency department with a history of and a chief complaint of having suffered a syncope episode.

30.     You have asked me to use the Texas legal definitions of negligence and proximate cause in formulating my opinions, and you have advised me that the Texas legal definition of negligence for a physician such as Evan Tow, D.O. a board certified emergency medicine physician, in providing the medical treatment in question to Mr. Holt means, "the failure to use ordinary care; that is, failure to do that which a board certified emergency medicine physician of ordinary prudence would have done under the same or similar circumstances, or doing that which a board certified emergency medicine physician of ordinary prudence would not have done under the same or similar circumstances" and that ordinary care, when used with respect to the conduct of Dr.Tow means "that degree of care that a board certified emergency medicine physician of ordinary prudence would use under the same or similar circumstances." You have further advised me that the Texas legal definition of proximate cause is with reference to the conduct of Dr. Tow means "that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such a board certified emergency physician using ordinary care would have foreseen that the event, or some similar event, might reasonably result there from." I believe that standard of care in this case is synonymous with the degree of care that an internist of ordinary prudence would use under the same or similar circumstances.

# APPENDIX EXHIBIT 3

31.    I equate negligence in this case to conduct that is beneath accepted standards of care. Whenever in this report I express an opinion that conduct is beneath accepted standards of care, I am also saying that such conduct amounts to negligence.

32.    An ordinarily prudent emergency room physician would know that Mr. Holt's chief complaint and presenting medical condition was that he had been working out, that he passed out, that he started turning blue, that his arms curled up, that he was provided cardio-pulmonary resuscitation, that after he became awake again that he was groggy and in a postictal state.

33.    Dr. Tow's failure to know Mr. Holt's chief complaint and presenting medical condition amounted to gross negligence and willful and wanton negligence.

34.    An ordinarily prudent emergency room physician would have known that Mr. Holt's chief complaint and presenting medical condition was that he had been working out, that he passed out, that he started turning blue, that his arms curled up, that he was provided cardio-pulmonary resuscitation, that after he became awake again that he was groggy and in a postictal state. All the nursing personnel in attendance of Mr. Holt in the emergency department knew that Mr. Holt's chief complaint and presenting medical condition was that he had been working out, that he passed out, that he started turning blue, that his arms curled up, that he was provided cardio-pulmonary resuscitation, that after he became awake again that he was groggy and in a postictal state.

35.    An ordinarily prudent emergency room physician would have admitted Mr. Holt to the hospital, consulted with a cardiologist to provide Mr. Holt with further medical screening examination. Dr. Tow admitted that if he had known that Mr. Holt's chief complaint and presenting medical condition was that he had been working out, that he passed out, that he started turning blue, that his arms curled up, that he was provided cardio-pulmonary resuscitation, that after he became awake again that he was groggy and in a postictal state, that he would have admitted Mr. Holt to the hospital and recommended a consultation with a cardiologist.

APPENDIX EXHIBIT 3

36.    Dr. Tow admitted that he was concerned by knowing that Mr. Holt had severe aortic stenosis and was working out, and that Mr. Holt should be seen immediately by a cardiologist. However, Dr. Tow, being of such belief and possessing such knowledge, discharged Mr. Holt and informed Mr. Holt that he was only dehydrated.  There is no documentation that Dr. Tow ever told Mr. Holt that his aortic stenosis was an issue or that he should see a cardiologist. Such failures on the part of Dr. Tow amounted to gross negligence and willful and wanton negligence.

37.    The above stated conduct on the part of Dr. Tow caused Mr. Holt to be told he only was suffering from dehydration.  If Dr. Tow had acted in the same manner as an ordinarily prudent emergency medicine physician would have acted, Mr. Holt would have been admitted to the hospital, Mr. Holt would have been told that he needed to have an aortic valve replacement, and he would have undergone an aortic valve replacement.  If Mr. Holt had an aortic valve replacement performed, he would not have suffered the fatal cardiac arrest on April 8, 2016.  Dr. Tow's willful and wanton negligence caused Mr. Holt to be misled into believing that he was merely dehydrated.  Mr. Holt passed on such misleading and incorrect information to Dr. Lisman.  Had Mr. Holt been correctly informed that his very severe aortic stenosis precipitated his syncope episode, he would have most likely made sure that Dr. Lisman re-evaluate him immediately.  If Mr. Holt had been admitted to the hospital, Mr. Holt would have undergone an aortic valve replacement and Mr Holt would have gone on to live a nearly normal life expectancy.

38.    The above described conduct on the part of Evan Tow, D.O. amounted to negligence and was a proximate cause of Mr. Holt's untimely death on April 8, 2016.

OPINIONS WITH RESPECT TO NEGLIGENCE OF CHI ST. LUKE'S PATIENTS MEDICAL CENTER

39.    I incorporate paragraphs 7 through 21 above, verbatim regarding the following opinions that I have regarding negligence on the part of CHI St. Luke's Patients Medical Center.

APPENDIX EXHIBIT 3

40.    You have asked me to use the Texas legal definitions of negligence and proximate cause in formulating my opinions, and you have advised me that the Texas legal definition of negligence for a hospital such as CHI St. Luke's Patients Medical Center, in providing the emergency medical services in question to Mr. Holt means, "the failure to use ordinary care; that is, failure to do that which a hospital of ordinary prudence would have done under the same or similar circumstances, or doing that which hospital of ordinary prudence would not have done under the same or similar circumstances" and that ordinary care, when used with respect to the conduct of CHI St. Luke's Patients Medical Center means "that degree of care that a hospital of ordinary prudence would use under the same or similar circumstances." You have further advised me that the Texas legal definition of proximate cause is, with reference to CHI St. Luke's Patients Medical Center, "that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such a hospital using ordinary care would have foreseen that the event, or some similar event, might reasonably result there from." I believe that standard of care in this case is synonymous with the degree of care that an hospital of ordinary prudence would use under the same or similar circumstances.

41.    I equate negligence in this case to conduct that is beneath accepted standards of care. Whenever in this report I express an opinion that conduct is beneath accepted standards of care, I am also saying that such conduct amounts to negligence.

42.    On January 11, 2016, when Mr. Holt was brought to the CHI St. Luke's Patients Medical Center emergency department, the hospital had staffed its emergency department with nurses and a physician. Those nurses were Christina Hamlyn, R.N., Elber DeLaCruz, R.N. and the physician was Evan Tow, D.O. Those nurses and Dr. Tow were a team and as a team worked together. The hospital's policy and procedure, "Medical Screening, Stabilization and Transfer of Individuals with Emergency Medical Conditions" required those nurses and Dr. Tow to provide Mr. Holt with an appropriate medical screening examination, that the policy and procedure

Page **14** of **16**

APPENDIX EXHIBIT 3

defines as the process required to determine, with reasonable clinical confidence, whether an Emergency Medical Condition does or does not exist. It is an ongoing process and must reflect continued monitoring according to the patient's needs and must continue until he/she is stabilized or appropriately transferred. The exam will include information about the chief complaint, the patient's vital signs, mental status assessment, general appearance, and a focused exam related to the patient's complaint."

43.      Dr. Tow claimed that he did not know Mr. Holt, after passing out, required cardio-pulmonary resuscitation. Dr. Tow testified that nurses Christina Hamlyn, R.N. and Elbert DeLaCruz, R.N. knew that and did not tell Dr. Tow that the information about Mr. Holt's chief complaint included that after passing out, Mr. Holt was provided cardio-pulmonary resuscitation to revive him. The part of the presenting history and chief complaint that after passing out, Mr. Holt was provided with cardio-pulmonary resuscitation to revive him was the critical and one of the most important facts of Mr. Holt's chief complaint and medical condition that brought him to the hospital's emergency department. Dr. Tow testified that the nurses should have told him that, and if he had known that Mr. Holt was provided with cardioi-pulmonary resuscitation to revive him, Dr. Tow would have admitted Mr. Holt to the hospital and recommended a consultation with a cardiologist. It is my opinion that if Mr. Holt had been admitted to the hospital, and evaluated by an ordinarily prudent cardiologist, Mr. Holt would have been advised that he needed to have his aortic valve replaced, and that he would have had an aortic valve replacement, and gone on to live a nearly normal life expectancy.

44.      The hospital, acting through its emergency department crew consisting of Christina Hamlyn, R.N. and Elber DeLaCruz, R.N. and Evan Tow, D.O. was negligent in failing to follow its policy and procedure to make sure that Dr. Tow knew that after Mr. Holt passed out while exercising that Mr. Holt was provided cardio-pulmonary resuscitation. Such negligence was also a proximate cause of Mr. Holt's untimely death on April 8, 2016.

APPENDIX EXHIBIT 3

45.     My opinions expressed in this report are supported by medical and scientific literature that is peer reviewed and/or considered by interventional cardiologists as reliable in the field of internal medicine, cardiology and interventional cardiology.

46.     All of the above stated opinions are based upon a reasonable degree of medical probability.  I reserve the right to make any changes or amendments to the above stated opinions, should additional facts become known to me.

_____
John S. MacGregor, Ph.D., M.D.

SUBSCRIBED TO ME AND SWORN TO BEFORE ME this the 27th day of June, 2017.

Personally known
Or Produced Identification     ✓
Type and # ID CADL  50888906

_____
Notary Public in and for
The State of **California**

SEE
ATTACHED

APPENDIX EXHIBIT 3

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____ San Francisco _____ )

On _____ JUNE 27 ___ , 2017 ____ before me, __ Ross Martin Hayduk, Notary Public _____

(insert name and title of the officer)

personally appeared _____ JOHN STRATHERN MACGREGOR III _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ **(Seal)**



ROSS MARTIN HAYDUK
Notary Public - California
San Francisco County
Commission # 2158641
My Comm. Expires Jun 30, 2020

APPENDIX EXHIBIT 3

**Curriculum Vitae**
**John S. MacGregor, M.D.**
**Division of Cardiology**
**Room 5G1**
**San Francisco General Hospital**
**1001 Potrero Avenue**
**San Francisco, CA 94110**
**(415) 206-8327**

**Born:**

Pensacola, Florida, February 14, 1952

**Education:**

B.A.   Biochemistry, June 1974
       University of California at San Diego
       La Jolla, California

Ph.D.  Biochemistry, January, 1981
       Cornell University Medical College
       New York, New York

M.D.   May 1984
       Cornell University Medical College
       New York, New York

**Academic Positions:**

University of California at San Francisco School of Medicine, San Francisco, California
       Professor of Medicine (Clinical). Director of Cardiac Catheterization Laboratory
       and Interventional Cardiology, San Francisco General Hospital, July 2003 – present.

University of California at San Francisco School of Medicine, San Francisco, California,
       Associate Clinical Professor of Medicine, Director of Cardiac Catheterization
       Laboratory and Interventional Cardiology, San Francisco General Hospital, July 1997 –
       2003.

University of California at San Francisco School of Medicine, San Francisco, California,
       Assistant Clinical Professor of Medicine, Director of Cardiac Catheterization
       Laboratory and Interventional Cardiology, San Francisco General Hospital, July 1991-July
       1997.

University of California at San Diego School of Medicine, San Diego, California,
       Assistant Clinical Professor of Medicine, 1987-1988.

The Rockefeller University, Post-doctoral Fellow, Department of Developmental and
       Molecular Biology, New York, NY, 1983-1984, Laboratory of Dr. G.M. Edelman.

APPENDIX EXHIBIT 3

Cornell University Medical College, Post-doctoral Fellow, Department of Medicine,
    New York, NY, 1981-1982, Laboratories of Drs. John H. Laragh and R.L. Soffer.

Roche Institute of Molecular Biology, Pre-doctoral Fellow, Department of Physiological
    Chemistry and Pharmacology, Nutley, NJ., 1976-1981, Laboratory of
    Dr. B. L. Horecker.

**Clinical Positions:**

Attending Physician, Department of Internal Medicine (Cardiology Division),
    University of California, San Francisco Medical Center, Moffitt-Long Hospitals
    1991-present.

Attending Physician, Department of Internal Medicine (Cardiology Division),
    Veterans Administration Hospital, San Francisco, California, 1993-2008.

Attending Physician, Department of Internal Medicine (Cardiology Division)
    San Francisco General Hospital, 1991-present.

Interventional Cardiology Fellow, Cardiovascular Research Institute and Department of
    Medicine, University of California at San Francisco, San Francisco, CA, 1990-1991.

Cardiology Fellow, Department of Medicine, University of California at San Francisco,
    San Francisco, California, 1988-1990.

Medical Resident, Department of Medicine, University of California at San Diego Medical
    Center, San Diego, California, 1985-1987.

Medical Intern, Department of Medicine, St. Luke's Hospital, New York, NY, 1984-1985.

Visiting Clinical Fellow in Medicine, Columbia University College of Physicians and
    Surgeons, New York, NY, 1984-1985.

**Awards and Honors:**

Joseph C. Cornwall Scholar of The Rockefeller University, 1983-1984.

The Dean William Mecklenburg Polk Memorial Prize (Cornell University) 1983 and 1984.

David P. Barr Fellow (Cornell University) 1982.

Roche Institute of Molecular Biology Pre-doctoral Fellowship, 1976-1981.

President's Research Fellowship (University of California) 1972-1974.

Teaching Award, Division of Cardiology, University of California San Francisco, June 14, 2009.

**APPENDIX EXHIBIT 3**

**Licensure and Board Certification**

Diplomate, American Board of Internal Medicine, subspecialty Cardiovascular Diseases.

Diplomate, American Board of Internal Medicine, added qualification Interventional Cardiology.

Diplomate, American Board of Internal Medicine (recertification in progress).

Diplomate, American Board of Medical Examiners.

California Medical License #G56033, expires 2-28-2019

**Fellowships:**

Fellow, American College of Cardiology, 1993.

Fellow, American College of Physicians, 1994.

**Publications:**

1.   MacGregor JS, Fisher GJ, Livingston RB: Jeopardy to brain development among some
     children in San Diego. San Diego Physcian 60:32-39, 1974.

2.   Livingston RB, Calloway DH, MacGregor JS, Fisher GJ, Hastings AB: U.S. poverty impact
     on brain development. In: Growth and development of the brain: Nutritional, genetic and
     environmental factors (Brazier, MAB, ed), pp. 377-394, Raven Press, New York, 1975.

3.   Lowey J, MacGregor JS, Rosenstone J, Schmidt J: Solubilization of an alphabungarotoxin-
     binding component from rat brain. Biochemistry 15:1522-1527, 1976.

4.   Livingston RB, Wilson KR, Atkinson B, Tribble GL, Rempel DM, MacGregor JS, Mills RE,
     Edge TC, Pakan SD: Quantitative cinemorphology of the human brain displayed by means
     of mobile computer graphics. Transactions of the American Neurological Association
     101:1-3, 1976.

5.   Livingston RB, Wilson KR, MacGregor JS, Rempel DM, Atkinson B, Tribble GL: The
     human brain: A dynamic view of its structures and organization. Wexler Films, Hollywood,
     California, 1976.

6.   MacGregor JS: Undernutrition in the United States, Testimony presented at the Nutrition-
     Related Oversight Review Hearings before the Subcommittee on Domestic and
     International Scientific Planning, Analysis and Cooperation of the Committee on Science
     and Technology, United States House of Representatives, Ninety-fifth Congress, First

06/27/17                                                                  John S. MacGregor

Session, July 26, 27, 28, August 2,3,4.  In Nutrition-Related Oversight Review, The
Congressional Record, US Government Pringint Office, Washington, D.C., 1977.

7.    Horecker BL, El-Dorry HA, Botelho LH, Sun SC, Chu DK, Lazo PA, Crivellaro O, Tsolas
      O, MacGregor JS, Pontremoli S:  Limited proteolysis of fructose 1,6-bisphosphatase.  In:
      Limited Proteolysis in Microorganisms, (Cohen, GN and Holzer H, eds.), DHEW
      Publication No. (NIH) 76-1591, p5, 1979.

8.    Horecker BL, MacGregor JS, Singh VN, Tsolas O, Sun SC, Crivellaro O, Pontremoli S:
      Partial amino acid sequence of rabbit liver fructose 1,6-bisphosphatase (Fru-$P_2$ase, EC
      3.1.3.11) and sites of cleavage by proteinases.  In:  FEBS Enzyme Regulation and
      Mechanism of Action, (Mildner P and Ries B, eds.), Pergamon Press, New York, Vol 60, pp.
      3-14, 1980.

9.    Singh VN, MacGregor JS, Pontremoli S, Horecker BL:  Inhibition of fructose 1,6-
      biphosphatase by excess substrate and its reversal by monovalent cations.  Bichem Biophys
      Res Commun, 94:1140-1144, 1980.

10.   MacGregor JS, Singh VN, Davoust S, Melloni E, Pontremoli S, Horecker BL:  Evidence for
      formation of a rabitt liver aldolase-rabbit liver fructose 1,6-bisphosphatase complex.  Proc
      Natl Acad Sci, USA, 77:3889-3892, 1980.

11.   MacGregor JS, Singh VN, Melloni E, Pontremoli S, Horecker BL:  Formation of a complex
      involving two gluconeogenic enzymes, fructose 1,6-bisphosphatase and fructose 1,6-
      bisphosphatase aldolase.  Journal of Scientific and Industrial Research, 39:719-724, 1980.

12.   Horecker BL, MacGregor JS, Singh VN, Melloni E, Pontremoli S:  Aldlase and fructose
      bisphosphatase:  Key enzymes in the control of gluconeogenesis and glycolysis.  In:  Current
      Topics in Cellular Regulation (Biological Cycles), Vol. 18 pp. 181-196, (Estabrook RW and
      Srere P, eds.) Academic Press, New York, 1981.

13.   Horecker BL, MacGregor JS, Pontremoli S:  Conservation of primary structure at the
      proteinase-sensitive site of vertebrate fructose 1,6-bisophosphatase.  In:  Science and
      Scientists:  Essays by biochemists, biologists and chemists, (Kageyama M, Nakamura K,
      Oschima T, Uchida T, eds.), pp. 107-117, Japan Scientific Societies Press, Tokyo, 1981.

14.   Hannappel E, MacGregor JS, Davoust S, Horecker BL: Limited proteolysis of liver and
      muscle aldolases:  Effects of subtilism, cathepsin B and Staphylococcus aureus protease.
      Arch Biochem Biophys, 214:293-298, 1982.

15.   El-Dorry HA, Pickett CB, MacGregor JS, Soffer RL:  Tissue-specific expression of mRNAs
      for dipeptidl carboxypeptidase isoenzymes.  Proc Natl Acad Sci, USA, 79:4295-4297.

16.   MacGregor JS, Hannappel E, Xu GJ, pontremoli S, Horecker BL:  Conservation of primary
      structure at the proteinase-sensitive site of fructose 1,6-bisphosphatase.  Arch Biochem
      Biophys, 217:652-664.

APPENDIX EXHIBIT 3

06/27/17                                                                 John S. MacGregor

17.    El-Dorry HA, MacGregor JS:  Rat and rabbit liver mRNAs code for fructose 1,6-bisphosphatases that differ in molecular weight.  Biochem Biophys Res Commun, 107:1384-1389, 1982.

18.    MacGregor JS, Resnick LM, Laragh JH:  Metabolites of thyrotropin releasing hormone inhibit angiotensin converting enzyme in vitro. Biochem Biophys Res Commu. 109:556-561, 1982.

19.    MacGregor JS, Annamalai A, Van Tol A, Black WJ, Horecker BL: Fructose 1,6-bisphosphatase from chicken and rabbit muscle. In: Methods and Enzymology, Vol 90, pp 340-345.  (Wood ed), Academic Press, Inc. New York, 1982.

20.    El-Dorry HA, MacGregor JS, Soffer RL:  Dipeptidyl carboxypeptidase from seminal fluid resembles the pulmonary rather than the testicular isoenzyme.  Biochem Biophys Res Commun, 115:1096-1100, 1983.

21.    Murray BA, Hemperly JJ, Gallin WJ, MacGregor JS, Edelman GM, Cunningham BA: Isolation of cDNA clones for the chicken neural cell adhesion molecule (N-CAM).  Proc Natl Acad Sci, USA, 81:5584-5588, 1984.

22.    MacGregor JS, Cheitlin MD:  Diagnosis and management of infective endocarditis.  Texas Hrt Inst J, 16(4):230-238, 1989.

23.    MacGregor JS, Wu AW, Rubin HR:  Pleuritic chest pain in a postpartum woman.  Arch Emerg Med, 8:271-273, 1991.

24.    Sudhir K, Fitzgerald P, MacGregor JS, DeMarco T, Ports TA, Chatterjee K, Yock PG: Transvenous Coronary Ultrasound Imaging:  A novel approach to visualization of the coronary arteries.  Circulation, 84:1957-61, 1991.

25.    Sudhir K, MacGregor JS, Barbant SD, Foster E, Fitzgerald PJ, Chatterjee K, Yock PG: Assessment of coronary conductance and resistance vessel reactivity in response to nitroglycerin, ergonovine and adenosine:  In vivo studies with simultaneous intravascular two-dimensional and Doppler ultrasound.  JACC, 21:1261-1268, 1993.

26.    Sudhir K, MacGregor JS, Gupta M, Barbant SD, Redberg R, Yock PG, Chatterjee K:  Effect of selective angiotensin II receptor antagonism and angiotensin converting enzyme inhibition on the coronary vasculature in vivo:  An intravascular two-dimensional and Doppler ultrasound study.  Circulation, 87:931-938, 1993.

27.    Sudhir K, MacGregor JS, Amidon TM, Gupta M, Yock PG, Chatterjee K:  Differential contribution of nitric oxide to regulation of vascular tone in coronary conductance and resistance arteries:  intravascular ultrasound studies.  Am. Heart J., 127:858-865, 1994.

28.    MacGregor JS, Cheitlin MD:  Cardiac tumors; cardiac manifestations of endocrine, collagen vascular and HIV disease; and traumatic injury of the heart.  In Internal Medicine, Stein, JH (ed.) Chapter 24 pp 323-329 (4th Edition), Mosby, St. Louis, 1994.

5

# APPENDIX EXHIBIT 3

06/27/17                                                                 John S. MacGregor

29.   MacGregor JS, Ports TA:  Catheter Balloon Valvuloplasty.  Chapter 34, Volume 2 pp 1-24
      In:  Cardiology, Parmley WW, Chatterjee K, EDS., J.B. Lippincott Co., Philadelphia, 1994.

30.   MacGregor JS, Cavero PG, McCluskey ER, Cheitlin MD:  Percutaneous valvuloplasty to
      relieve stenosis of a bioprosthetic tricuspid valve in a patient with bacterial endocarditis.  Am
      Heart J., 128:199-202, 1994.

31.   Sudhir K, MacGregor JS, DeMarco T, DeGrout C, Taylor R, Chou TM, Yock PG,
      Chatterjee K:  Cyclosporin impairs release of endothelium-derived relaxing factors in
      epicardial and resistance coronary arteries.  Circulation, 90:3018-3023, 1994.

32.   Cheitlin MD, MacGregor JS:  Acquired Tricuspid and Pulmonary Valve Disease.  In:  Atlas
      of Heart Disease, Valvular Heart Disease and Endocarditis.  Rahimtoola SH and
      BraunwaldE (Eds).  Vol XI Chapter 11 11.1-11.13.

33.   Michaels AD, Lederman RJ, MacGregor JS, Cheitlin MD:  Cardiovascular involvement in
      AIDS.  Current Problems in Cardiology, Volume 22, No. 3, pp. 109-148, March, 1997

34.   Michaels AD, Whisenant BK, MacGregor JS:  Multivessel coronary thrombosis treated with
      Abciximab (ReoPro) in a patient with essential thrombocythemia.  Clinical Cardiology
      21:134-138, 1998.

35.   MacGregor JS, Cheitlin MD:  Cardiac tumors, cardiac manifestations of endocrine, collagen
      vascular, and HIV disease, and traumatic injury of the heart.  In:  Internal Medicine, Stein JH
      (Ed.) (5th Edition), Mosby, St. Louis Chapter  33 pp 329-334, 1998.

36.   Cheitlin MD, MacGregor JS:  Acquired Tricuspid and Pulmonary Valve Disease.  In:
      Comprehensive Cardiovascular Medicine, Topol E.J. (ed.) Chapter 24 pp 587-608.
      Lippincott-Raven, Philadelphia and New York, 1998.

37.   Cheitlin, MD. MacGregor JS, Acquired Tricuspid and Pulmonary Valve Disease. In:
      Textbook of Cardiovascular Medicine (Second Edition),  Topol, EJ (ed) Chapter 23
      Pp 529-548.  Lippincott-Raven, Philadelphia and New York, 2002.

38.   MacGregor, JS, Balloon Valvuloplasty for Mitral Stenosis:  Current Indications and Long
      Term Results.  In:  MDConsult-Cardiology (Braunwald, E. ED)  August 2002.

39.   Hsue, PY, Giri, K, Erickson, S., MacGregor, JS, Younes, N, Shergill, A, Waters, DD:
      Clinical Features of Acute Coronary Syndromes in Patients with Human Immunodeficiency
      Virus Infection. Circulation 109:316-319, 2004.

40.   Cheitlin, M.D., MacGregor, John S., Congenital Anomalies of Coronary Arteries.  Role in
      the Pathogenesis of Sudden Cardiac Death.  Hertz 34: 268-279, 2009.

41.   Yeo, KK, Mahmud, E, Armstrong, EJ, Bennett, WE, Shunk, KA, MacGregor, JS, Li,
      Zongmin, Low, RI, Rogers, JH, Contemporary Clinical Characteristics, Treatment, and
      Outcomes of Angiographically Confirmed Coronary Stent Thrombosis: Results from a

6
APPENDIX EXHIBIT 3

John S. MacGregor

Multicenter California Registry.  Catheterization and Cardiovascular Interventions, March 1, 79(4):550-556, 2012.

42.     Armstrong, EJ, Yeo, KK,  Javed, U, Mahmud, E, Patel, M, Shunk, KA, MacGregor, JS, Low, RI, Rogers, JH, Angiographic Stent Thrombosis at  Coronary Bifurcations:  Short and Long Term Prognosis.  JACC Cardiovascular Interventions 5:57-63, 2012.

43.     Bhave, PD, Hoffmayer, KS, Armstrong, EJ, Garg, S, Patel, A, MacGregor, JS, Stein, JC, Kinlay, S, Ganz, P, McCabe, JM, Predictors of Depressed Left Ventricular Function in Patients Presenting with ST-Elevation Myocardial Infarction.  Am. J. Cardiol., 109(3):327-331, 2012.

44.     Secemsky, EA, Lange, David, Ho, JE, Brayton, K, Ganz, P, Farr, G, MacGregor, JS, Hsue, PY,  Improvement in Revascularization  Time After  Creation of a Coronary Catheterization Lab at a Public Hospital.   Arch. Int. Med. 172(2):193-194, 2012.

45.     Armstrong, EJ, Kulkarni, AR, Hoffmayer, KS, Bhave, PD, MacGregor, JS, Hsue, P, Stein JC, Kinlay, S, Ganz, P, McCabe, JM,  Delaying Primary Percutaneous Coronary Intervention for Computed Tomographic Scans in the Emergency Department.  Am. J. Cardiol., 110:345-349, 2012.

46.     McCabe, JM, Armstrong, EJ, Hoffmayer, KS, Bhave, PD, Macgregor, JS, Hsue, P., Stein, JC, Kinlay, S., Ganz, P., Impact of Door-to-Activation Time on Door-to-Balloon Time in Primary Percutaneous Coronary Intervention for ST-Segment Elevation Myocardial Infarctions:  A Report from the Activate-SF Registry.  Circ. Cardiovasc. Qual. Outcomes, 5(5):672-9,  2012.

47.     McCabe, JM, Armstrong, EJ, Kulkarni, A, Hoffmayer, KS, Bhave, PD, Garg, S, Patel, A, MacGregor, JS, Hsue, P, Stein, JC, Kinlay, S, Ganz, P, Prevalence and factors associated with false-positive ST-segment elevation myocardial infarction diagnoses at primary percutaneous coronary intervention-capable centers:  a report from the Activate-SF registry.  Arch Intern Med., 172(11):864-71,  2012.

48.     Armstrong, EJ, Kulkarni, AR, Bhave, PD, Hoffmayer, KS, MacGregor, JS, Stein, JC, Kinlay, S, Ganz, P, McCabe, JM,  Electrocardiographic criteria for ST-elevation myocardial infarction in patients with left ventricular hypertrophy,  Am J Cardiol. 110(7):977-83,  2012.

49.     Selby, VN, Scherzer, R, Barnett, CF, MacGregor, JS, Morelli, J, Donovan, C, Deeks, SG, Martin, JN, Hsue, PY, Doppler echocardiography does not accurately estimate pulmonary artery systolic pressure in HIV-infected patients.  AIDS  26(15):1967-9, 2012.

50.     Waldo, SW, Armstrong, EJ, Yeo, KK, Mahmud, E, Patel, M, Reeves, R, MacGregor, JS, Low, RI, Rogers, JH, Shunk, KA, Comparison of procedural success and long-term outcomes of stent thrombosis in coronary bypass grafts versus native coronary arteries.  Am J Cardiol.  111(5):689-94, 2013.

# APPENDIX EXHIBIT 3

51.    Parikh, R, Scherzer, R, Nitta, EM, Leone, A, Hur, S, Mistry, V, MacGregor, JS, Martin, JN, Deeks, SG, Ganz, P, Hsue, PY, Increased levels of asymmetric dimethylarginine are associated with pulmonary arterial hypertension in HIV infection. Journal of Acquired Immune Deficiency Syndrome (in press).

52.    Armstrong, EJ, Kwa, AT, Yeo, KK, Mahmud, E, Javed, U, Patel, M, Shunk, KA, MacGregor, JS, Low, RI, Rogers, JH, Angiographically confirmed stent thrombosisin contemporary practice: insights from intravascular ultrasound. Cath. Cardiovasc. Int.81:782-790, 2013.

53.    Surman, AM, Conrad, MB, Barnett, CF, MacGregor, JS, Nanavati, S, Wilson, MW, Biliary cardiac tamponade as a result of iatrogenic biliary-pericardial fistula. Journal of Vascular and Interventional Radiology, 24 (No. 12):1925-1928, 2013.

54.    Parikh RV, Ma Y, Scherzer R, Heringer AS, MacGregor, JS, Martin JN, Deeks SG, Ganz P, Hsue PY. Endothelin-1 Predicts Hemodynamically Assessed Pulmonary Arterial Hypertension in HIV Infection PLoSOne 2016; 11 (1): e0146355. PMID: 226752193.

EXHIBIT B

1.      As of January 11, 2016, Jessie Ross Holt had been diagnosed with having severe aortic stenosis.  He had undergone multiple echocardiograms between July 31, 2013 and November 13, 2015.[1]

2.      On January 11, 2016, Mr. Holt was brought to the CHI St. Luke's Patients Medical Center emergency department by ambulance on January 11, 2016.[2]

3.      The EMS report stated that Mr. Holt was a 44 year old male found laying supine on the ground at 24 Hour Fitness, that per the staff he was running on a treadmill, passed out, and fell, that he started to turn blue, and his arms curled up, and a 24 Hour Fitness employee started CPR, and aft`er a few minutes he became awake, but was confused.[3]

4.      Mr. Holt arrived at the CHI St. Luke's Patients Medical Center emergency department at approximately 3:54 p.m.  Triage was performed at approximately 4:03 p.m.[4]

5.      The EMS personnel informed the emergency room crew of the foregoing history and the foregoing history was known to the emergency room crew.[5]

6.      Mr. Holt had undergone a transesophageal echocardiogram at Patients Medical Center July 31, 2013, and the report of that echocardiogram that documented that Mr. Holt had severe aortic stenosis was available to and known to the emergency room crew.[6]

7.      Mr. Holt was evaluated by the emergency medicine physician on duty (Evan Tow, D.O.).[7]  Dr. Tow documented that his impression or diagnosis was that Mr. Holt had heat exhaustion/syncope,[8] and Mr. Holt was discharged at approximately 5:49 p.m.[9]  Dr. Tow informed Mr. Holt and his wife that all Mr. Holt had was dehydration.[10]  The discharge instructions provided to Mr. Holt pertained only to syncope and dehydration.[11]

---

[1]  Plaintiffs' Exhibit 9 (Houston Cardiovascular Associates records)
[2]  Plaintiffs' Exhibit 1 pps 48, 61- 69
[3]  Plaintiffs' Exhibit 1 p 63
[4]  Plaintiffs' Exhibit 1 pps 48, 61 - 69
[5]  Deposition of Jason Case, R.N 20.4 – 21.4
[6]  Deposition of Jason Case, R.N 36.20 – 37.10 and CHI000025 & 26
[7]  Deposition of Evan Tow, D.O. 7.19 – 7.22 and Plaintiffs' Exhibit 1 pps 46 & 47
[8]  Plaintiffs' Exhibit 1 p 47
[9]  Plaintiffs' Exhibit 1 p 47
[10]  Deposition of Evan Tow, D.O. 75.4 – 75.17
[11]  Plaintiffs' Exhibit 1 pps 38 - 45

APPENDIX EXHIBIT 3

8.     The following morning (January 12, 2016), Mr. Holt telephoned his cardiologist, Kevin Lisman, M.D. to inform him about what occurred in the emergency department, and Dr. Lisman had his medical assistant inform Mr. Holt that Dr. Lisman agreed that Mr. Holt was just dehydrated.[12]

9.     On April 8, 2016, Mr. Holt was exercising on a treadmill at 24 Hour Fitness, he passed out, he was taken to a hospital in an ambulance and pronounced to be dead.[13] An autopsy stated that the cause of death was hypertensive and valvular cardiovascular disease.[14]

10.    Triage Nurse, Christina Hamlyn, R.N. documented that the chief complaint was possible seizure activity unwitnessed:  postictal on arrival of EMS.  No history of seizures.  Bystanders did CPR.  Patient with pulses on arrival of EMS and awake. VSS.  Patient still groggy on arrival to ER. Slow to answer but AAOX4.[15]  Mr. Holt was triaged at 1603 and given a discharge assessment at 1748.[16]

11.    Emergency department nurse Elbert DeLaCruz, R.N. testified that Mr. Holt came to the emergency department requesting examination or treatment for a medical condition and that the medical condition was that while he was working out on a treadmill at 24 Hour Fitness, he passed out, fell to the floor, started turning blue, required cardiac CPR to revive him.  He was groggy, and he came in with a history of aortic stenosis.[17]  He testified that the chief complaint, given by EMS was that he was working out at 24 Hour Fitness, he passed out, he fell to the floor.  He started turning blue and required CPR to revive him and that after a few minutes he became awake but was groggy.[18]

12.    Defendant Patients Medical Center selected and presented Jason Case, R.N., the director of its emergency department, to give deposition testimony on its behalf on the facts and circumstances related to Mr. Holt's condition while he was in the emergency department,[19] and he testified that the history that was been communicated to the emergency room department was that Mr. Holt was laying supine on the ground at 24 Hour Fitness, that per the staff, the patient was running on a treadmill, passed out and fell, that the patient started to turn blue and his arms curled up, that a 24 Hour Fitness employee started CPR, that after a few minutes the patient became awake but confused, that upon assessment the patient was awake and would look at the EMS person and say his name but that he was confused about what happened and what was going on.[20]  Mr. Holt had a transesophageal

---

[12] Deposition of Kevin Lisman, M.D.64.17 – 66.14 and 1/12/16 note of Collette Ramirez
[13] Plaintiffs' Exhibit 8 (Medical Examiner's Report)
[14] Plaintiffs' Exhibit 8 (Medical Examiner's Report)
[15] Plaintiffs' Exhibit 1, p. 48, deposition of Christina Hamlyn, R.N. 18.16 to 19.3
[16] Plaintiffs' Exhibit 1 pps. 48 & 49
[17] Deposition of Elbert DeLaCruz, R.N. 31.12 to 32.16
[18] Deposition of Elbert DeLaCruz, R.N. 44.6 – 44.16
[19] Deposition of Jason Case, R.N. 5.15 – 5.25
[20] Deposition of Jason Case, R.N. 20.17 – 21.4

APPENDIX EXHIBIT 3

echocardiogram at Patients Medical Center on July 31, 2013 that documented that he had severe aortic stenosis, and that the record of that echocardiogram was there at the hospital when Mr. Holt was in the emergency department on January 11, 2016.[21] He testified that Mr. Holt's presenting complaint was that while jogging on a treadmill at 24 Hour Fitness he passed out, started turning blue, his arms started curling up and he required CPR to revive him and that is the history they were given.[22]

13.    The Patients Medical Center physician in its emergency department on January 11, 2016, who evaluated Mr. Holt was Evan Tow, D.O.  Dr. Tow testified that when Mr. Holt arrived at the emergency department that Mr. Holt had an emergency medical condition.[23]  Dr. Tow claimed in his deposition that he did not know that Mr. Holt began turning blue with his arms curling up, and requiring CPR to revive him[24] and he did not look at the July 31, 2013 echocardiogram report showing that Mr. Holt's aortic stenosis was severe.[25]  He testified the reason he did not look at the echocardiogram report that was in the hospital was because he had 40 patients in the emergency department.[26]  He claimed that if the triage nurse had history that bystanders performed CPR on Mr. Holt, to revive him after he passed out at 24 Hour Fitness, that the triage nurse should have told him that.[27]  He claims that the EMS personnel gave him history as Mr. Holt was being brought into the emergency department, and they did not tell him that Mr. Holt, after passing out started turning blue, that his arms curled up, and that he required CPR to revive him.  Dr. Tow testified that if he had known that if Mr. Holt, after passing out started turning blue, that his arms curled up, and that he required CPR to revive him, that he would have worked him up as a cardiac arrest and not as a syncope,[28] and that he would have admitted Mr. Holt to the hospital to the care of an internist and he would have recommended a consultation by a cardiologist.[29]  Dr. Tow testified that the approach to a patient in the emergency department is teamwork and the nurses should have told him Mr. Holt required CPR.[30]  Dr. Tow knew that aortic stenosis that precipitates a syncope spell is an emergency medical condition.[31]  Dr. Tow testified that it was within his medical knowledge that if a patient had severe aortic stenosis that precipitated a syncope spell that it could happen again, and that was a concern of his that Mr. Holt was exercising, and that when Mr. Holt was in the emergency department

---

[21]  Id. 36.20 – 37.12
[22]  Id. 74.11 – 74.20
[23]  Deposition of Evan Tow, D.O. 7.25 – 9.7 – 19.12
[24]  Deposition of Evan Tow, D.O. 7.25 – 9.7, 38.4 – 38.12, 44.18 -45.19, 64.14 – 65.20
[25]  Deposition of Evan Tow, D.O. 10.3 – 10.16
[26]  Deposition of Evan Tow, D.O. 10.3 – 10.16
[27]  Deposition of Evan Tow, D.O. 38.4 – 38.12
[28]  Deposition of Evan Tow, D.O. 29.10 – 30.16
[29]  Deposition of Evan Tow, D.O. 29.10 – 30.16, 39.9 – 39.23, 70.21 – 71.6
[30]  Deposition of Evan Tow, D.O. 44.18 – 45.13, 85.23 – 86.7
[31]  Deposition of Evan Tow, D.O. 80.15 – 80.19.

APPENDIX EXHIBIT 3

he was concerned that Mr. Holt should not be exercising with severe aortic stenosis, and that the reason that was a concern to him is that Mr. Holt should have an immediate consult with his cardiologist.[32] Dr. Tow testified that the hospital's policy and procedure applied to Mr. Holt and every patient who came to the emergency department.[33] Dr. Tow created a record of his examination of Mr. Holt.[34] Dr. Tow's impression was documented to be heat exhaustion/syncope,[35] Mr. Holt was discharged at 1754 with discharge instructions related to heat exhaustion and syncope.[36]

14. Dr. Tow's note in the medical record stated in part as follows: *chief complaint "passed out while jogging, out 2 minutes, took a ??? has bicuspid aortic valve with ?????. Loss of consciousness. Post-ictal symptoms: confusion ??? aortic stenosis scan cardiologist 11/15. Chest x-ray; cardiomegaly, urine dark, 1711 feels better. Clinical Impression: heat exhaustion/dehydration.*[37]

15. Many of the entries Dr. Tow made are in cursive hand writing, and he could not read many of the things he wrote on pages 46 and 46 of Plaintiffs' Exhibit 1 because he had a lot of patients and had to write quickly.[38] Dr. Tow testified he did not look at the July 31, 2013 transesophageal echocardiogram report that was available to look at because he did not have time because he had forty patients in the emergency room.[39]

16. Bottom line on Dr. Tow's testimony is If he had known that Mr. Holt was provided CPR, Dr. Tow would have worked him up as a cardiac arrest, and would have admitted him to the hospital and recommended a consultation by a cardiologist. But because Dr. Tow claimed he did not know about the CPR, which he should have known, he diagnosed Mr. Holt as having passed out due to heat exhaustion, and discharged Mr. Holt one hour and forty-five minutes after Mr. Holt was triaged.

17. An emergency medical services crew brought Mr. Holt to the hospital and informed the hospital's emergency room personnel that Mr. Holt was a 44-year-old laying supine on the ground at 24 Hour Fitness, that per the staff, he was running on a treadmill and passed out, they stated he started to turn blue and his arms curled up, a 24 Hour Fitness employee started CPR, that after a few minutes he became awake but he was confused, that upon assessment that he became awake and

---

[32] Deposition of Evan Tow, D.O. 80.25 – 82.13
[33] Deposition of Evan Tow, D.O. 91.5 – 91.12
[34] Plaintiffs' Exhibit 1 pps. 46 & 47
[35] Plaintiffs' Exhibit 1 p. 47
[36] Plaintiffs' Exhibit 1 pps. 38 - 45
[37] Plaintiffs' Exhibit 1 pps.46 & 47
[38] Deposition of Evan Tow, D.O. 48.24 – 49.18
[39] Deposition of Evan Tow, D.O. 10.3 – 10.16

Page **4** of **10**

APPENDIX EXHIBIT 3

will look and say his name, and that the patient seemed confused about what happened and what was going on.[40]

18.     The ER crew knew that there was an episode of unresponsiveness followed by bystander CPR, and he became awake and alert afterwards and that that's consistent with a cardiac arrest, and that everyone in the ER due to their education and training would know that.[41]  However, Dr. Tow claimed he never knew Mr. Holt had been given CPR or that he had turned blue after passing out, and if he had known that, he would have worked Mr. Holt up for cardiac arrest, he would have admitted Mr. Holt to the hospital and recommended a consultation with a cardiologist, instead of discharging him less than two hours after Mr. Holt's arrival at the emergency department with a diagnosis of heat exhaustion/syncope/dehydration.  Dr. Tow testified that the approach to the patient in the emergency department is teamwork, that the nurses take history and communicate it to him, but the nurses did not communicate to him that bystanders had provided Mr. Holt with CPR to revive him.  Dr. Tow testified that the nurses should have told him that.[42]

19.     It was further known by the emergency room personnel that there was a record at the hospital reporting the transesophageal echo-cardiogram performed at the hospital on July 31, 2013 by one of the hospital's staff cardiologists, Satish Cayenne, M.D. that documented that Mr. Holt had severe aortic stenosis, that he had a bicuspid aortic valve that was heavily calcified, that the peak aortic velocity was 5.0 m/sec corresponding to a peak aortic valve gradient of about 100 mmHg.[43]

20.     The emergency room crew knew that what the EMS crew reported about Mr. Holt that occurred at the 24 Hour Fitness were consistent with a cardiac arrest.[44]

21.     Elbert De La Cruz, R.N., one of the emergency department nurses who provided emergency room care to Mr. Holt knew that a 44 year old male, who had been working out on a treadmill at a gym who passes out, and falls to the ground and starts to turn blue and their arms start to curl up and they require cardiac CPR to revive them and when they come to, they're groggy, that those are signs and symptoms of a cardiac arrest,[45]  and that a cardiac arrest is an emergency medical condition.[46]

22.     The nurses would know that a person with an aortic stenosis has a predisposition for a cardiac arrest and that aortic stenosis can precipitate a cardiac arrest in a patient who is exercising strenuously.[47]

---

[40] Deposition of Jason Case, R.N.  p. 51.15 to 56.13
[41] Id.
[42] Deposition of Evan Tow, D.O.  44.18 – 45.19
[43] Id .and (Plaintiffs' Exhibit 11)
[44] Id.
[45] Deposition of Elbert De La Cruz, R.N.  6.21 to 7.2
[46] Deposition of Jason Case, R.N. 56.23 to 57.1 and Elbert De La Cruz 20.1 to 20.19
[47] Deposition of Jason Case, R.N.  26.15 – 27.9

APPENDIX EXHIBIT 3

23.     Kevin Lisman, MD, (cardiologist and defendant in this case) testified that facts that are documented in the Patients Medical Center records about the history of Mr. Holt coming in with severe aortic stenosis, and that while he was working out on a treadmill at 24 Hour Fitness, he passed out and fell to the floor, that he started turning blue, that his arms started curling up, that he required cardiopulmonary resuscitation to revive him, and that after a few minutes when he came to he was groggy, that those are signs and symptoms of a possible cardiac arrest.[48]

24.     Dr. Lisman testified that if somebody comes in to the emergency room with a history of severe aortic stenosis and has just had a syncope spell where they passed out and started turning blue, then that is possibly an immediately life-threatening condition.[49]

25.     Dr. Lisman testified that any physician licensed in the State of Texas would put cardiac arrest on their differential diagnosis.[50] and that a general practitioner would be expected to know the basic things about the signs and symptoms of a cardiac arrest.[51]

26.     Dr. Lisman testified that If Mr. Holt was working out on a treadmill and passed out, and started turning blue, and his arms started curling up, and he required CPR to revive him and after a few minutes he was revived and was groggy and also had a history of aortic stenosis: a cardiac arrest would be on the differential diagnosis. Such a condition or circumstance would be an emergency medical condition and any licensed medical doctor in the State of Texas would know that.[52] Every licensed medical doctor in the State of Texas should know that there is a relationship between severe aortic stenosis and a syncope spell and that they should take a detailed history that includes learning about the severe aortic stenosis and the details that led to the syncope episode. [53] The job of any doctor is to conduct such an examination, obtain sufficient additional history, and such additional testing to find out what is really going on, because if you have an emergency medical condition that could kill the patient, you have to undertake such testing, history, and examination to rule out that life threatening condition.[54]

27.     Dr. Lisman testified that the aortic stenosis could cause the syncope spell on January 11, 2016, and if it was a factor that could have caused a cardiac arrest. It could precipitate an arrhythmia during exertion and if it happens once, it could happen again.[55] If Mr. Holt had another syncope spell and another cardiac arrest, it could be fatal.[56] Mr. Holt was in a high-risk group if he had a cardiac

---

[48] Deposition of Kevin Lisman, M.D. 82.23 – 84.21
[49] Id. at 81.10 – 81.16
[50] Id. at 82.23 – 84.21
[51] Id. at 82.23 – 84.21
[52] Id. at 101.19 – 102.8
[53] Id. at 112.1 – 112.13
[54] Id. at 103.3 – 104.6
[55] Id. at 86.20-87.12
[56] Id. at 88.3 – 88.21118.1 – 118.8

Page **6** of **10**

APPENDIX EXHIBIT 3

arrest related to his syncope spell, and he could have had another one on January 14, or January 15.[57]

28.     The Examination and Treatment for Emergency Medical Conditions and Women in Labor (EMTALA), 42 USCS § 1395dd provides as follows:

(a) Medical screening requirement.  In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this title [42 USCS §§ 1395 et seq.]) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor.

(1) In general. If any individual (whether or not eligible for benefits under this title [42 USCS §§ 1395 et seq.]) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection

(e) Definitions.  In this section:

(1) The term "emergency medical condition" means--

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part; or

(3) (A) The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the

---

[57] Id. at 116.23 – 117.4

individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

(B) The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

29.   The hospital had in place a policy and procedure entitled "Medical Screening, Stabilization and Transfer of Individuals with Emergency Medical Conditions" (hereinafter referred to as the policy and procedure) and it applied to Mr. Holt.[58]  That policy and procedure provided in part as follows:

"Any patient who comes to the facility requesting an examination or treatment for a medical condition must be provided with an appropriate medical screening examination to determine if the patient is suffering from an Emergency Medical Condition, and, and if it is determined that the that the individual has an Emergency Medical Condition, to provide the individual with such further medical examination and treatment as required to stabilize[59] the Emergency Medical Condition, within the capability of Patients Medical Center, or to arrange for transfer of the individual to another medical facility in accordance with the procedures set forth before."

"Medical Screening Examination – the process required to determine, with reasonable clinical confidence, whether an Emergency Medical Condition does or does not exist[60]. It is an ongoing process and must reflect continued monitoring according to the patient's needs and must continue until he/she is stabilized or appropriately transferred.  The exam will include information about the chief complaint, the patient's vital signs, mental status assessment, general appearance, and a focused exam related to the patient's complaint.  Note:  Triage is not the equivalent of a medical screening exam.  Physician and/or qualified licensed Allied Health Professional are the only profession approved to complete a medical screening examination at Patients Medical Center."

Individuals Who Have An Emergency Medical Condition

a.  When it is determined that the individual has an Emergency Medical Condition, Patients Medical Center shall:

---

[58]  Plaintiffs' Exhibit 2 (CHI000099 – 0000104) and Deposition Jason Case, R.N,  56.14 to 56.22

[59]  The only thing that would stabilize the condition was an aortic valve replacement.

[60]  Process required is to call in a cardiologist and cardiac surgeon to assess severity of the aortic stenosis that has become symptomatic.

Page **8** of **10**

APPENDIX EXHIBIT 3

i. Within the capability of the staff and facilities at Patients Medical Center, stabilize the individual to the point where the individual is either "stable for discharge" or "stable for transfer," as defined in Section IV.G and Section IV.H.

To "stabilize" or "stabilize" or "stabilized" means:

With respect to an Emergency Medical Condition, that the individual is provided with such medical treatment as is necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the patient from Patients Medical Center."

Stable for discharge means:

The physician has determined within reasonable clinical confidence, that the patient has reached the point where his/her continued medical treatment, including diagnostic work-up or treatment, could reasonably be performed as an outpatient or later as an inpatient, as long as the patient is given a plan for appropriate follow-up care with discharge instructions."

Note: "Stable for discharge" does not require the final resolution of the Emergency Medical Condition. However, the patient is never considered "stable for discharge: if within reasonable medical probability the patient's condition would materially deteriorate after discharge."

30. That policy and procedure defines what an emergency medical condition is and it was applicable to Mr. Holt on January 11, 2016.[61] A cardiac arrest is an emergency medical condition.[62] The facts stated on page 63 of the Emergency Room records are consistent with a cardiac arrest.[63]

31. On January 12, 2016, Mr. Holt contacted Houston Cardiology Associates to talk to Dr. Lisman about what had transpired. Dr. Lisman's medical assistant was informed that Mr. Holt was working out on a treadmill, that his heart started pounding, and that he passed out. The medical assistant informed Dr. Lisman, and Dr. Lisman had the medical assistant advise Mr. Holt that Dr. Lisman agreed that Mr. Holt was just dehydrated and that he should keep himself hydrated.[64] Dr. Lisman did not personally speak with or evaluate Mr. Holt. Dr. Lisman knew that if you have a patient with severe aortic stenosis and that the patient has syncope, that it is incumbent upon the healthcare providers to investigate to determine the connection between

---

[61] Deposition of Jason Case, R.N.  56.14 – 56.22
[62] Deposition of Elbert De La Cruz, R.N.  20.1 to 20.19 and Deposition of Jason Case, R.N. 56.23 to 57.1
[63] Deposition of Elbert De La Cruz, R.N.  14.14 to 15.6
[64] Deposition of Collette Ramirez at 10.19 – 13.21

APPENDIX EXHIBIT 3

the syncope and the aortic stenosis.[65]  Dr. Lisman knew that if the patient becomes symptomatic that the patient needs surgery.[66]  Dr. Lisman knew that if a patient with aortic stenosis passed out while exercising that the patient needed to be evaluated.[67]  Dr. Lisman testified that Mr. Holt coming into the emergency department with a history that he was working out on a treadmill at 24/7 fitness, that he passed out and fell to the floor, that he started turning blue and his arms started curling up, that he required cardiopulmonary resuscitation to revive him and when he came to, he was groggy, that those are signs of a possible cardiac arrest, that any licensed physician in the State of Texas would have put cardiac arrest on a differential diagnosis, and if cardiac arrest is on the differential diagnosis, such a physician would have to do something to rule out a cardiac arrest.[68]  Dr. Lisman further testified that you have to put aortic stenosis with syncope on your differential diagnosis, and that means the if Mr. Holt had another syncope spell and cardiac arrest that it could be fatal.[69]  Dr. Lisman also testified that it is the job of any doctor to conduct such examination, obtain sufficient additional history and do such additional testing to find out what is really going on, and if you have got an emergency medical condition that could possibly kill the patient you have to undertake such testing, history, and examination to rule out the life-threatening condition,[70] and that every licensed medical doctor in the State of Texas would know that there is a relationship between severe aortic stenosis and a syncope spell,[71] because if somebody has a cardiac arrest and also has severe aortic stenosis, that is a very severe emergency.[72]

32.     On April 8, 2016, Mr. Holt was working out on treadmill, he passed out, cardiopulmonary resuscitation was provided and he was taken to Pasadena Bayshore Hospital, where he was pronounced dead. An autopsy was performed and the cause of death was reported as hypertensive and valvular cardiovascular disease. Dr. Lisman did not think that there was error in the autopsy report, and that Mr. Holt's aortic stenosis could have been a cause of his death.[73]

---

[65] Deposition of Kevin Lisman, M.D. 19.21 – 20.5 and 33.20 - 21
[66] Id. at 53.14 - 16
[67] Id. at 33.20 - 22
[68] Deposition of Kevin Lisman, M.D. at 82.23 – 84.21
[69] Id. at 88.3 – 88.21
[70] Id. at 103.3 – 104.6
[71] Id. at 112.1 – 112.13
[72] Id. at 115-13 – 115.17
[73] Id. at 104.18 – 24 and 106.11 - 17

APPENDIX EXHIBIT 3